**LAKE CARRIERS' ASSOCIATION, a corporation, et al., Plaintiffs**

**v.**

**Ralph A. MacMULLAN, Individually, and as Director, Michigan Department of Natural Resources, et al., Defendants.**

**Civ. A. No. 36194.**

United States District Court, E. D. Michigan, S. D.

July 12, 1971.

Scott H. Elder, Johnson, Branand & Jaeger, Cleveland, Ohio, for plaintiffs; John Arthur Hamilton, Foster, Meadows & Ballard, Detroit, Mich., of counsel.

Frank J. Kelly, Atty. Gen. by Jerome Maslowski and Francis J. Carrier, Asst. Attys. Gen., Lansing, Mich., for defendants.

3. 284 F.2d 879 (1st Cir. 1960).

Robert A. Jenkins, Scholl, Jenkins, Robinson & Stieg, Detroit, Mich., for Dominion Marine Assn., amicus curiae.

Victor G. Hanson, Detroit, Mich., for Seafarers International Union of North America, Great Lakes District, AFL–CIO and Maritime Trades Dept., AFL–CIO, amicus curiae.

Robert A. Jenkins, Scholl, Jenkins, Robinson & Stieg, Detroit, Mich., and Nicholas J. Healy, Healy & Baillie, and Gordon W. Paulsen, Haight, Gardner, Poor & Havens, New York City, for American Institute of Merchant Shipping and others, amici curiae.

Stanley Lubin, Detroit, Mich., for International Union, UAW, amicus curiae.

Before EDWARDS, Circuit Judge, and KEITH and PRATT, District Judges.

## MEMORANDUM OPINION

PHILIP PRATT, District Judge:

Plaintiffs in this proceeding are the Lake Carriers' Association and 19 of its 21 member companies who own and operate Great Lakes cargo vessels. Defendants are the Attorney General of the State of Michigan, the Michigan Department of Natural Resources and its Director and the Michigan Water Resources Commission and its Executive Secretary.

The complaint seeks a declaratory judgment holding that the Michigan Water Pollution Act of 1970 (Act 167 of Public Acts of 1970), M.C.L.A. §§ 323, 331 et seq. is constitutionally infirm and conflicts with federal legislation, and correspondingly, requests that the State of Michigan be enjoined from enforcing that Act.

A three judge Court was convened pursuant to Section 2284 of Title 28 of the United States Code and a hearing was conducted on April 26 and 27, 1971.

The plaintiffs present five major issues as the basis for relief:

1. That the federal government has pre-empted the field of pollution control in the waters of the Great Lakes and that the Michigan Water Pollution Act conflicts with a federal statute, specifically (Water Pollution Control Act as amended by the Water Quality Improvement Act of 1970, 33 U.S.C. Sec. 1151 et seq.); the said federal statute manifests the intention of the federal government to occupy the field exclusively; and that federal vessel inspection laws, administered by the U. S. Coast Guard, preclude state prescription of shipboard equipment.

2. That the Michigan Water Pollution Act places an undue burden on interstate commerce.

3. That the Michigan Water Pollution Act interferes materially with uniform maritime law.

4. That the Michigan Water Pollution Act denies plaintiffs due process and the equal protection of the laws.

5. That the language and provisions of the Michigan Water Pollution Act are unconstitutionally vague and, thus, unenforceable.

Great Lakes shipping can be characterized as a large, vital and sophisticated industry. It traverses all of the Great Lakes, the connecting waterways and tributaries and touches upon the states of Minnesota, Wisconsin, Illinois, Indiana, Michigan, Ohio, Pennsylvania and New York and the Canadian provinces of Ontario and Quebec. The advent of the St. Lawrence Seaway System provides an international flavor to shipping on the Great Lakes.

As an example of the size and scope of the industry, as of January 1, 1970, there were a total of 442 vessels in excess of 1,000 tons on the Great Lakes. Of this total, 263 were vessels of United States Registry, having a combined tonnage of 1,802,776 gross tons, and 179 were vessels of Canadian Registry having a combined tonnage of 1,576,165 gross tons. Flow charts indicate that the total commerce of the lakes in 1964 was 210,830,576 short tons with the primary commodities being iron ore, coal, grain, stone, petroleum, cement and sand and gravel. Of this commerce, about one-third (approximately 72 million

short tons) utilizes or touches Michigan ports. A resume of trade patterns and courses shows that Great Lakes cargo vessels cross and criss-cross during the shipping season from a great variety of ports within the Great Lakes waterway system, and may enter a particular state's waters frequently without touching at a port in that state. Generally, if recommended navigational courses are followed, the vessels do not, while traversing open waters come within three miles of land except when entering or leaving a port or when in a connecting waterway.

A typical or average Great Lakes cargo vessel would be between 500 and 600 feet in length, have a gross tonnage of 7,500 tons and a carrying capacity of 12,000 gross tons. It is a flat-decked vessel except for the "houses" fore and aft where are located the crew quarters, machinery, supplies, navigational and other equipment necessary to the operation of the vessel. The center length of the vessel is devoted to cargo. Crew sizes range from 30 to 35 men per vessel and it is estimated each man daily generates 125 gallons of liquid waste (including wash and bathing water and sanitary flush water).

Recognizing the need for pollution control devices and systems, a part at least of the Great Lakes shipping industry has taken some steps in the direction of reducing the discharge of pollutants. Approximately 30 ships have installed a macerating-chlorinating system and another 26 (including four Canadian registry vessels) have installed biogest systems. Other systems are also being tried empirically aboard some vessels, and are of the incinerating or of the "package-treatment plant" type.

It is within the foregoing context that the State of Michigan enacted the Water Pollution Control Act of 1970, and began its implementation by, first, enforcing the requirements relating to pleasure craft and then by approaching the owners and operators of Great Lakes cargo vessels in order to obtain compliance with the provisions of the Act.

The Water Pollution Control Act of 1970, (a copy of which is attached hereto as Appendix A) as particularly pertinent here, provides that:

Sec. 3. (1) A person shall not place, throw, deposit, discharge or cause to be discharged into or onto the waters of this state, any litter, sewage, oil or other liquid or solid materials which render the water unsightly, noxious or otherwise unwholesome so as to be detrimental to the public health or welfare or to the enjoyment of the water for recreational purposes.

and,

Sec. 4. (2) A person owning, operating or otherwise concerned in the operation, navigation or management of a watercraft having a marine toilet shall not own, use or permit the use of such toilet on the waters of this state unless the toilet is equipped with 1 of the following pollution control devices:

(a) A holding tank or self-contained marine toilet which will retain all sewage produced on the watercraft for subsequent disposal at approved dockside or onshore collection and treatment facilities.

(b) An incinerating device which will reduce to ash all sewage produced on the watercraft. The ash shall be disposed of onshore in a manner which will preclude pollution.

Sec. 11. Any person who violates any provision of this act is guilty of a misdemeanor and shall be fined not more than $500.00. To be enforceable, the provision or the rule shall be of such flexibility that a watercraft owner, in carrying out the provision or rule, is able to maintain maritime safety requirements and comply with the federal marine and navigation laws and regulations.

From the above provisions, it appears that the legislature of the State of Michigan sought to draw a distinction between the discharge of "noxious" materials and the discharge of "sewage"

(defined in Section 2(d) as ". . . . all human body wastes treated or untreated."), in the latter instance requiring either a holding tank or an incinerating device, whereas in the former the prohibition does not proscribe the discharge of "treated" material.

As a result of the overtures of state officials, with the aim of establishing voluntary compliance within a reasonable time, some ship owners have installed holding tanks to control sewage discharge; for example, Ford Motor Company has installed two 1,000 gallon holding tanks on each of its six vessels at a cost of approximately $20,000.00 per vessel. The Ford vessels' holding tanks are pumped out at the Ford dock when the ships return to their port by the utilization of septic tank pump-out trucks at a cost of between $50.00 and $70.00 per ship.

The latter finding points up a significant feature, that is, that Michigan has, as yet, provided no pump-out facilities at any of its ports, although it is anticipated that arrangements with municipal authorities or others (including dock owners and ship owners or operators with their own docks) will establish a network of such facilities.

Against this background is superimposed the entry of the federal government by virtue of the Water Quality Improvement Act of 1970, supra, which has as one of its major purposes pollution control of navigable waters, including the Great Lakes system.

In paraphrase, the federal Act provides that as soon as possible after April 3, 1970, the Secretary of Interior shall promulgate federal standards of performance for marine sanitation devices which shall be designed to prevent the discharge of untreated or inadequately treated sewage into or upon the navigable waters of the United States. (Section 1163(b) (1).) The Act also provides that initial standards and regulations shall become effective for new vessels two years after promulgation and for existing vessels five years after promulgation. (Section 1163(c) (1).)

Subsection (f) of Section 1163 prohibits any state from enforcing any statute or regulation with respect to the design, manufacture, or installation or use of any marine sanitation device on any vessel subject to the section after the effective date of the initial standards and regulations promulgated under the section. A state may, however, apply to the Secretary for a regulation prohibiting the discharge of *any* sewage into waters of that state. (Emphasis supplied.)

There is no dispute that the vessels and waters covered by the Federal Act are the same vessels and waters which are the subject matter of this case. The cause of plaintiffs' anxiety and apprehension is not, however, limited to the alleged conflict between the Federal Act and the Michigan Act. For example, pollution control of the waters of the Great Lakes has been a matter of discussion between the governments of the United States and Canada and specific reference has been made to the problem of achieving compatible regulations governing waste disposal by commercial vessels. (Ex. 23, Communique of the Canada/United States Ministerial Meeting on Great Lakes Pollution, June 23, 1970); the Canadian government has circularized to the shipping industry proposed regulations governing sewage and garbage disposal on the Great Lakes waters within its boundaries (Ex. 22); in early 1968, Federal authorities met with representatives of Lake Michigan states regarding pollution control of that Lake and it was there recognized that sewage disposal directly into Lake Michigan waters was a distinct threat to the quality of the Lake (Ex. 21); a bill has been introducd into the Wisconsin legislature which purports to regulate sewage discharge from commercial vessels into the waters of that state (Exhibit D).

Adding to the uncertainties created by the foregoing is the expressed fear of the plaintiffs that Michigan may, administratively or judicially, interpret its statutes to require that Great Lakes ves-

sels install huge holding tanks of a capacity (40,000 gallons) that would retain for eventual pumping out *all* materials, fluids and substances generated by and on a vessel.

Inherent, then, in this situation, assert the plaintiffs, is the real possibility that each of the governmental units involved, if left to their own devices, would promulgate different, conflicting standards, prohibitively costly and structurally dangerous and, presumably, each statute with a criminal penalty.

But with a recitation of what is, should be coupled a recitation of what is not. In that balance sheet lies the real crux of the issues presented and the role of this Court.

The pollution of our environment has become a major problem of our society. There is hardly an industry, a governmental unit, a citizens' organization—nor even a person—who is not daily confronted with dire warnings regarding the danger confronting our ecology if corrective and reparative steps are not taken immediately. There are few dissenters and conflicts appear to arise only as to timetables, methods and expense. Investigations, studies, reports, surveys and conferences abound.

Michigan has chosen to promulgate a program, which is original within the Great Lakes region as it respects lakes pollution. No other state, province or national government has, as yet, instituted a Great Lakes pollution control program although certainly each is involved and concerned. The significant factor is, however, that the plaintiffs here request relief on the basis of an *anticipation* that other governmental units will act, presumably in the imminently near future and that such action will in fact conflict with Michigan standards.

Further, although the plaintiffs asserted that the Michigan statute might or could be interpreted to require holding tanks of 40,000 gallon capacity, there is no substantial grounds for that assertion, particularly in view of the stated position of Michigan authorities that the holding tank provision is aimed at the elimination of the practice of discharging *human wastes* into Michigan waters.

Primary in the factual picture and, therefore, paramount in the Court's consideration, is the attitude of Michigan authorities who seek the cooperation of the industry in the implementation of its program and have not instigated, nor does it appear, threatened criminal prosecutions.

It is this consideration that gives us the starting point of our discussion of the issues.

Wilson v. Schnettler, 365 U.S. 381, at page 385, 81 S.Ct. 632, at page 635, 5 L.Ed.2d 620, provides a succinct guideline regarding the role of the federal courts vis a vis state courts, when Justice Whittaker wrote:

There is still another cardinal reason why it was proper for the District Court to dismiss the complaint. We live in the jurisdiction of two sovereignties. Each has its own system of courts to interpret and enforce its laws, although in common territory. These courts could not perform their respective functions without embarrassing conflicts unless rules were adopted to avoid them. Such rules have been adopted. One of them is that an accused "should not be permitted to use the machinery of one sovereignty to obstruct his trial in the courts of the other, unless the necessary operation of such machinery prevents his having a fair trial." Ponzi v. Fessenden, 258 U.S. 254, 260 [42 S.Ct. 309, 310, 66 L.Ed. 607]. Another is that federal courts should not exercise their discretionary power "to interfere with or embarrass threatened proceedings in state courts save in those exceptional cases which call for the interposition of a court of equity to prevent irreparable injury which is clear and imminent . . . . ." Douglas v. City of Jeannette, *supra*, [319 U.S. 157] at [page] 163, [63 S. Ct. 877 at page 881].

A later exposition of the principle is contained in Dombrowski v. Pfister, 380 U.S. 479, pages 484, 485, 85 S.Ct. 1116, pages 1119, 1120, 14 L.Ed.2d 22, where it was said:

". . . . considerations of federalism have tempered the exercise of equitable power, for the Court has recognized that federal interference with a State's good-faith administration of its criminal laws is peculiarly inconsistent with our federal framework. It is generally to be assumed that state courts and prosecutors will observe constitutional limitations as expounded by this Court, and that the mere possibility of erroneous initial application of constitutional standards will usually not amount to the irreparable injury necessary to justify a disruption of orderly state proceedings."

The impact of *Wilson* and *Dombrowski* is a pervading one, particularly, as here, where dealing as we are with a penal statute, prosecution has not been instituted and threatened prosecution does not appear imminent. (See Doe v. Randall, 314 F.Supp. 32, D.Minn., aff'd Hodgson v. Randall, 402 U.S. 967, 91 S. Ct. 1656, 29 L.Ed.2d 132.)

Nor is there any intimation that the "necessary operation" of state court machinery would prevent a fair trial.

On the contrary, there is every reason to believe that the Michigan court system, with its declaratory judgment procedures (Michigan Court Rules, GCR 1963, Section 521) provide full and adequate machinery to insure a fair hearing of plaintiffs' cause. More importantly, there is every reason to believe that the Michigan courts are eminently qualified to apply constitutional standards studiously and assiduously in their determinations regarding the validity of state statutes.

Reviewing the issues framed previously, there appears to this Court to be compelling reasons to abstain from consideration of the matter in its present posture.

■ With regard to pre-emption, the Supreme Court in Swift & Co. v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed. 2d 194, held that Supremacy Clause cases are not within the purview of a three judge court.

■ With regard to the other issues, the lack of a justiciable controversy precludes entry of this Court into the matter. No prosecution is pending, nor threatened which would realistically infer that plaintiffs in a trial of a case would be denied the benefits of the Due Process and Equal Protection clauses or that a State court would not consider the other constitutional issues with circumspection and thoroughness in the usual and normal course.

An overview of the factual situation presented by the evidence in this case compels but one conclusion: that the plaintiffs here are seeking an advisory opinion that would have the effect of prohibiting any state action in the field of Great Lakes water pollution until such time as the federal government manifests its intention and takes control. This the Court declines to do, especially upon reflection of the clear direction given by the Supreme Court in Public Service Commission of Utah, et al., v. Wycoff Company, Inc., 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291, which involved an interestingly similar situation.

Summarizing the case before it, the Supreme Court said (page 245, 73 S.Ct. page 241):

"In the first place, this dispute has not matured to a point where we can see what, if any, concrete controversy will develop. It is much like asking a declaration that the State has no power to enact legislation that may be under consideration but has not yet shaped up into an enactment."

And went on to say, (pages 247, 248, 73 S.Ct. pages 242, 243):

"Declaratory proceedings in the federal courts against state officials must be decided with regard for the implications of our federal system.

254

State administrative bodies have the initial right to reduce the general policies of state regulatory statutes into concrete orders and the primary right to take evidence and make findings of fact. It is the state courts which have the first and the last word as to the meaning of state statutes and whether a particular order is within the legislative terms of reference so as to make it the action of the State. We have disapproved anticipatory declarations as to state regulatory statutes, even where the case originated in and was entertained by courts of the State affected. Alabama State Federation of Labor v. McAdory, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725. Anticipatory judgment by a federal court to frustrate action by a state agency is even less tolerable to our federalism. Is the declaration contemplated here to be *res judicata*, so that the Commission cannot hear evidence and decide any matter for itself? If so, the federal court has virtually lifted the case out of the State Commission before it could be heard. If not, the federal judgment serves no useful purpose as a final determination of rights.

The procedures of review usually afford ample protection to a carrier whose federal rights are actually invaded, and there are remedies for threatened irreparable injuries. State courts are bound equally with the federal courts by the Federal Constitution and laws. Ultimate recourse may be had to this Court by certiorari if a state court has allegedly denied a federal right.

In this case, as in many actions for declaratory judgment, the realistic position of the parties is reversed. The plaintiff is seeking to establish a defense against a cause of action which the declaratory defendant may assert in the Utah courts. Respondent here has sought to ward off possible action of the petitioners by seeking a declaratory judgment to the effect that he will have a good defense when and if that cause of action is asserted. Where the complaint in an action for declaratory judgment seeks in essence to assert a defense to an impending or threatened state court action, it is the character of the threatened action, and not of the defense, which will determine whether there is a federal-question jurisdiction in the District Court. If the cause of action, which the declaratory defendant threatens to assert, does not itself involve a claim under federal law, it is doubtful if a federal court may entertain an action for a declaratory judgment establishing a defense to that claim. This is dubious even though the declaratory complaint sets forth a claim of federal right, if that right is in reality in the nature of a defense to a threatened cause of action. Federal courts will not seize litigations from state courts merely because one, normally a defendant, goes to federal court to begin his federal-law defense before the state court begins the case under state law. Tennessee v. Union & Planters' Bank, 152 U.S. 545 [14 S.Ct. 654, 38 L.Ed. 511]; The Fair v. Kohler Die & Specialty Co., 228 U.S. 22 [33 S.Ct. 410, 57 L.Ed. 716]; Taylor v. Anderson, 234 U.S. 74 [34 S.Ct. 724, 58 L.Ed. 1218]."

For the foregoing reasons, this Court will abstain from further consideration of the matter.

The Court is mindful of the recent action of the Environmental Protection Agency which on May 12, 1971, published a "Notice of Proposed Rule Making". The Notice announces that the Agency proposed to amend 18 CFR Part 640 by the promulgation of marine sanitation standards which would permit the use of described treatment devices. Holding tanks or incinerating devices are not required under the proposed standards. The Notice also provides that interested persons may submit views, comments and recommendations concerning the proposed standard to the Agency within 45 days of publication of the Notice.

Defendants have conceded that preemption would take place when the initial standards and regulations become effective. Certainly the current action of the Environmental Protection Agency must be carefully considered by the defendants in the interpretation and enforcement of the Michigan statute. This circumstance serves to emphasize the reluctance and declination of the Court to intrude into a matter which is yet unformed.

The temporary restraining order heretofore entered is dissolved and the complaint dismissed without prejudice to plaintiffs to institute other appropriate judicial proceedings.