LAKE CARRIERS' ASSN. ET AL *v.* MACMULLAN
ET AL.

No. 71–422.   Argued March 22–23, 1972—Decided May 30, 1972

Brennan, J., delivered the opinion of the Court, in which Douglas, Stewart, White, and Marshall, JJ., joined. Blackmun, J., filed a statement concurring in the result, in which Rehnquist, J., joined, *post*, p. 513. Powell, J., filed a dissenting opinion, in which Burger, C. J., joined, *post*, p. 513.

*Scott H. Elder* argued the cause for appellants. With him on the briefs was *John A. Hamilton*.

*Robert A. Derengoski,* Solicitor General of Michigan, argued the cause for appellees. With him on the brief were *Frank J. Kelley,* Attorney General, and *Jerome Maslowski* and *Francis J. Carrier,* Assistant Attorneys General.

Briefs of *amici curiae* urging reversal were filed by *Robert A. Jenkins* and *Fenton F. Harrison* for the Dominion Marine Assn., and by *Nicholas J. Healy* and *Gordon W. Paulsen* for Assuranceforeningen Gard et al.

*Louis J. Lefkowitz,* Attorney General, *pro se, Samuel A. Hirshowitz,* First Assistant Attorney General, and *Thomas F. Harrison* and *Philip Weinberg,* Assistant Attorneys General, filed a brief for the Attorney General of New York as *amicus curiae* urging affirmance.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

This is an appeal from the judgment of a three-judge District Court, convened under 28 U. S. C. §§ 2281, 2284, dismissing a complaint to have the Michigan Watercraft Pollution Control Act of 1970, Mich. Comp. Laws Ann. § 323.331 *et seq.* (Supp. 1971), declared invalid and its enforcement enjoined. 336 F. Supp. 248 (1971). We noted probable jurisdiction, 404 U. S. 982 (1971), and affirm the District Court's determination to abstain from decision pending state court proceedings.

The Michigan statute, effective January 1, 1971, provides in pertinent part:

"Sec. 3. (1) A person [defined in § 2 (i) to mean "an individual, partnership, firm, corporation, association or other entity"] shall not place, throw, deposit, discharge or cause to be discharged into or onto the waters of this state, any . . . sewage [defined in § 2 (d) to mean "all human body wastes, treated or untreated"] . . . or other liquid or solid materials

which render the water unsightly, noxious or otherwise unwholesome so as to be detrimental to the public health or welfare or to the enjoyment of the water for recreational purposes.

"(2) It is unlawful to discharge, dump, throw or deposit . . . sewage . . . from a recreational, domestic or foreign watercraft used for pleasure or for the purpose of carrying passengers, cargo or otherwise engaged in commerce on the waters of this state.

"Sec. 4. (1) Any pleasure or recreational watercraft operated on the waters of this state which is moored or registered in another state or jurisdiction, if equipped with a pollution control device approved by that jurisdiction, may be approved by the [State Water Resources Commission of the Department of Natural Resources] to operate on the waters of this state.

"(2) A person owning, operating or otherwise concerned in the operation, navigation or management ·of a watercraft [defined in § 2 (g) to include "foreign and domestic vessels engaged in commerce upon the waters of this state" as well as "privately owned recreational watercraft"] having a marine toilet shall not own, use or permit the use of such toilet on the waters of this state unless the toilet is equipped with 1 of the following pollution control devices:

"(a) A holding tank or self-contained marine toilet which will retain all sewage produced on the watercraft for subsequent disposal at approved dockside or onshore collection and treatment facilities.

"(b) An incinerating device which will reduce to ash all sewage produced on the watercraft. The ash shall be disposed of onshore in a manner which will preclude pollution.

.        .        .        .        .

"Sec. 8. . . . Commercial docks and wharfs designed for receiving and loading cargo and/or freight from commercial watercraft must furnish facilities, if determined necessary, as prescribed by the commission, to accommodate discharge of sewage from heads and galleys : . . [of] the watercraft which utilize the docks or wharfs.

.     .     .     .     .

"Sec. 10. The commission may promulgate all rules necessary or convenient for the carrying out of duties and powers conferred by this act.

"Sec. 11. Any person who violates any provision of this act is guilty of a misdemeanor and shall be fined not more than $500.00. To be enforceable, the provision or the rule shall be of such flexibility that a watercraft owner, in carrying out the provision or rule, is able to maintain maritime safety requirements and comply with the federal marine and navigation laws and regulations."

Appellees—the State Attorney General, the Department of Natural Resources and its Director, and the Water Resources Commission and its Executive Secretary—read these provisions as prohibiting the discharge of sewage, whether treated or untreated, in Michigan waters and as requiring vessels with marine toilets to have sewage storage devices.

Appellants—the Lake Carriers' Association and individual members who own or operate federally enrolled and licensed Great Lakes bulk cargo vessels—challenge the Michigan law on a variety of grounds. They urge that the Michigan law is beyond the State's police power and places an undue burden on interstate and foreign commerce, impermissibly interferes with uniform maritime law, denies them due process and equal protection of the laws, and is unconstitutionally vague. They also contend that the Michigan statute conflicts with or is

pre-empted by federal law, primarily [1] the Federal Water Pollution Control Act, as amended by the Water Quality Improvement Act of 1970, and is therefore invalid under the Supremacy Clause. Under the Water Quality Improvement Act, the Administrator of the Environmental Protection Agency [2] is directed "[a]s soon as possible, after April 3, 1970, . . . [to] promulgate Federal standards of performance for marine sanitation devices . . . which shall be designed to prevent the discharge of untreated or inadequately treated sewage into or upon the navigable waters of the United States from new vessels and existing vessels, except vessels not equipped with installed toilet facilities." 84 Stat. 100, 33 U. S. C. § 1163 (b)(1).[3] These standards, which as of now are not issued,[4] are to become effective for new vessels two years after promulgation and for existing vessels five years after promulgation. 84 Stat. 101, 33 U. S. C. § 1163 (c)(1). Thereafter, "no State . . . shall adopt or enforce any statute or regulation . . . with respect to the

---

[1] Appellants also contend that the Michigan law is pre-empted by the Steamboat Inspection Acts of Feb. 28, 1871, 16 Stat. 440, and of May 27, 1936, 49 Stat. 1380, as amended, 46 U. S. C. § 361 *et seq.* An *amicus curiae,* moreover, presses the contention, suggested in appellants' complaint, that the Michigan law conflicts with the United States-Canadian Boundary Waters Treaty of 1909, 36 Stat. 2448, as well as enters into the domain of foreign affairs constitutionally reserved to the National Government. See Brief of Dominion Marine Association *amicus curiae.*

[2] The authority to administer the Water Quality Improvement Act, originally lodged in the Secretary of the Interior, was transferred to the Administrator of the Environmental Protection Agency by Reorganization Plan No. 3 of 1970, set out in the Appendix to Title 5 of the United States Code.

[3] "Sewage" is defined under the Act to mean "human body wastes and the wastes from toilets and other receptacles intended to receive or retain body wastes." 84 Stat. 100, 33 U. S. C. § 1163 (a)(6).

[4] A notice of proposed standards was, however, published on May 12, 1971. See 36 Fed. Reg. 8739.

design, manufacture, or installation or use of any marine sanitation device on any vessel subject to the provisions of this section." *Id.,* § 1163 (f). However, "[u]pon application by a State, and where the Administrator determines that any applicable water quality standards require such a prohibition, he shall by regulation completely prohibit the discharge from a vessel of any sewage (whether treated or not) into those waters of such State which are the subject of the application and to which such standards apply." *Ibid.* Thus, the federal law appears to contemplate sewage control through on-board treatment before disposal in navigable waters, unless the Administrator provides on special application for a complete prohibition on discharge in designated areas.

The District Court below did not reach the merits of appellants' complaint on the ground that "the lack of a justiciable controversy precludes entry of this Court into the matter." 336 F. Supp., at 253.[5] "An overview of the factual situation presented by the evidence in this case," said the District Court, "compels but one conclusion: that the plaintiffs here are seeking an advisory

[5] The District Court also noted that "[w]ith regard to pre-emption, the Supreme Court in Swift & Co. v. Wickham, 382 U. S. 111 [1965], held that Supremacy Clause cases are not within the purview of a three judge court." 336 F. Supp., at 253. Appellants correctly point out that in reinstating that rule, *Wickham* made clear that a three-judge court *is* the proper forum for all claims against the challenged statute so long as there is a nonfrivolous constitutional claim that constitutes a justiciable controversy and warrants, on allegations of irreparable harm, consideration for injunctive relief. See 382 U. S., at 122 n. 17, 125. Indeed, that was the explicit holding in *Florida Lime & Avocado Growers, Inc.* v. *Jacobsen,* 362 U. S. 73, 80–81 (1960), re-affirming prior cases. It is clear that appellants' complaint satisfies this test if the constitutional issues raised are justiciable controversies. Since we hold, *infra,* that they are, three-judge court jurisdiction exists over all of appellants' claims, including the Supremacy Clause issues.

opinion . . . ." *Ibid.* The District Court also found "compelling reasons to abstain from consideration of the matter in its present posture," *ibid.*—namely, "the attitude of Michigan authorities who seek the co-operation of the industry in the implementation of its program and have not instigated, nor does it appear, threatened criminal prosecutions," *id.,* at 252;[6] the availability of declaratory relief in Michigan courts; the possibility of a complete prohibition on the discharge of sewage in Michigan's navigable waters under federal law;[7] the absence of existing conflict between the Michigan requirements and other state laws;[8] and the pub-

---

[6] The Michigan authorities have so far generally refrained from prosecution because adequate land-based pump-out facilities are not yet available to service vessels equipped with sewage storage devices. See *infra,* at 507–508. After oral argument here, the Solicitor General of Michigan informed us "that local officials in Cheboygan County, Michigan, have 'ticketed' a Coast Guard Captain for discharging sewage into the waters of the Great Lakes." However, "to assure the Court that Michigan will not depart from the representations it has made to the Court," the Solicitor General stated that he is "taking immediate steps to quash the charge or have the local court stay its hand until" the decision here.

[7] Michigan has filed an application with the Administrator of the Environmental Protection Agency for a prohibition under 33 U. S. C. § 1163 (f) on the discharge of any sewage, treated or untreated, into all of the State's waters subject to the Water Quality Improvement Act. The Administrator has indicated that any no-discharge regulation issued will not become effective before the effective date of the initial standards promulgated under § 1163 (b) (1). See 36 Fed. Reg. 8739–8740. Appellants argue that the Administrator's authority to issue no-discharge regulations is narrow and could not encompass a complete prohibition on discharge throughout Michigan's navigable waters. Since we find, *infra,* that the possibility of such a prohibition is immaterial to the issues answered here, we need not now decide this question.

[8] Appellants contend in this regard that the laws of other States dealing with the discharge of sewage are critically different from the Michigan statute in various respects. This question, too, we need

lication of proposed federal standards that might be considered by Michigan in the interpretation and enforcement of its statute.[9]

Appellants now urge that their complaint does present an "actual controversy" within the meaning of the Declaratory Judgment Act, 28 U. S. C. § 2201, that is ripe for decision. We agree. The test to be applied, of course, is the familiar one stated in *Maryland Casualty Co.* v. *Pacific Coal & Oil Co.,* 312 U. S. 270, 273 (1941): "Basically, the question in each case is whether . . . there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Compare, *e. g., ibid.,* with, *e. g., Golden* v. *Zwickler,* 394 U. S. 103 (1969). Since, as appellees concede,[10] the Michigan requirements on the discharge of sewage will be preempted when the federal standards become effective, the gist of appellants' grievance is that, according to Michigan authorities, they are required under Michigan law to install sewage storage devices that (1) may become unnecessary once federal standards, authorizing discharge of treated sewage, become applicable or (2) may, in any event, conflict with other state regulations pending the promulgation and effective date of the federal

---

not address, since we find, *infra,* that the presence or absence of conflicting state requirements is irrelevant.

[9] See n. 4, *supra.*

[10] Although appellees took an equivocal position on this question in oral argument here, see Tr. of Oral Arg. 36–39, the District Court below expressly found such a concession, see 336 F. Supp., at 255, and appellees repeated the concession in opposing appellants' jurisdictional statement. See Brief in Support of Motion to Dismiss or Affirm 11. In any event, the terms of the Water Quality Improvement Act are clear that pre-emption occurs at least when the initial federal standards promulgated under the Act become effective. See 33 U. S. C. § 1163 (f), quoted in part, *supra,* at 503–504. See also 36 Fed. Reg. 8739–8740.

standards. The immediacy and reality of appellants' concerns do not depend, contrary to what the District Court may have considered, on the probability that federal standards will authorize discharge of treated sewage in Michigan waters or that other States will implement sewage control requirements inconsistent with those of Michigan. They depend instead only on the present effectiveness in fact of the obligation under the Michigan statute to install sewage storage devices. For if appellants are now under such an obligation, that in and of itself makes their attack on the validity of the law a live controversy, and not an attempt to obtain an advisory opinion. See, e. g., Southern Pacific Co. v. Arizona, 325 U. S. 761 (1945) (existing burden on interstate commerce justiciable controversy in absence of federal pre-emption or other conflicting state laws).

Regarding the present effectiveness in fact of a statutory obligation, the plurality opinion in Poe v. Ullman, 367 U. S. 497, 508 (1961), stated that a justiciable controversy does not exist where "compliance with [challenged] statutes is uncoerced by the risk of their enforcement." That, however, is not this case. Although appellees have indicated that they will not prosecute under the Michigan act until adequate land-based pump-out facilities are available to service vessels equipped with sewage storage devices, they have sought on the basis of the act and the threat of future enforcement to obtain compliance as soon as possible. The following colloquy that occurred on oral argument here is instructive, Tr. of Oral Arg. 34–35:

> "[Appellees]: . . . We urge that the leadtime for the construction or erection of pump-out facilities is necessary, and there would be no enforcement until pump-out facilities were available.

> .    .    .    .    .

"Q. But you're insisting that the carriers get ready to comply and——

"[Appellees]: Yes, sir.

"Q. —because if you wait until pump-out stations are ready to begin [servicing] tanks, then there will be another great delay?

"[Appellees]: Oh, yes, sir.

"Q. So you have a rather concrete confrontation with these carriers now, don't you?

"[Appellees]: Yes, sir, we do. . . ."

Thus, if appellants are to avoid prosecution, they must be prepared, according to Michigan authorities, to retain all sewage on board as soon as pump-out facilities are available, which, in turn, means that they must promptly install sewage storage devices.[11] In this circumstance, compliance is coerced by the threat of enforcement, and the controversy is both immediate and real. See, e. g., *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925); *City of Altus, Oklahoma* v. *Carr,* 255 F. Supp. 828, aff'd *per curiam,* 385 U. S. 35 (1966). See generally, e. g., Comment, 62 Col. L. Rev. 106 (1962).[12]

---

[11] Appellees stressed in oral argument here that "[t]he provision for pump-out facilities is no great mechanical accomplishment." Tr. of Oral Arg. 35. This only reinforces the conclusion that appellants must, according to Michigan authorities, quickly get into a position to comply with the Michigan statute.

[12] In coming to a contrary conclusion, the District Court relied heavily on *Public Serv. Comm'n* v. *Wycoff Co.,* 344 U. S. 237 (1952), where we held that declaratory relief was inappropriate in behalf of a carrier seeking a determination that its intrastate transportation constituted interstate commerce. The District Court's reliance on that decision was misplaced. As the Court said in *California Comm'n* v. *United States,* 355 U. S. 534, 538–539 (1958), *Wycoff Co.* was a case "where a carrier sought relief in a federal court against a state commission in order 'to guard against the possibility,' [344 U. S.], at 244, that the Commission would assume jurisdiction." Here, as in *California Comm'n,* the confrontation between the parties

Appellants next argue that the District Court erred in abstaining from deciding the merits of their complaint.[13] We agree that abstention was not proper on the majority of grounds given by the District Court, but hold that abstention was, nevertheless, appropriate for another reason suggested but not fully articulated in its opinion. Abstention is a "judge-made doctrine . . . , first fashioned in 1941 in *Railroad Commission* v. *Pullman Co.,* 312 U. S. 496, [that] sanctions . . . escape [from immediate decision] only in narrowly limited 'special circumstances,' *Propper* v. *Clark,* 337 U. S. 472, 492," *Zwickler* v. *Koota,* 389 U. S. 241, 248 (1967), justifying "the delay and expense to which application of the abstention doctrine inevitably gives rise." *England* v. *Medical Examiners,* 375 U. S. 411, 418 (1964). The majority of circumstances relied on by the District Court in this case do not fall within that category. First, the absence of an immediate threat of prosecution does not argue against reaching the merits of appellants' complaint. In *Younger* v. *Harris,* 401 U. S. 37 (1971), and *Samuels* v. *Mackell,* 401 U. S. 66 (1971), this Court held that, apart from "extraordinary circumstances," a federal court may not enjoin a pending state prosecution or declare invalid the statute under which the prosecution was brought. The decisions there were premised on considerations of equity practice and comity in our federal system that have little force in the absence of a pending state proceeding. In that circumstance, exercise of federal court jurisdiction ordinarily is appropriate if the conditions for declaratory or injunctive relief are met. See generally

has already arisen, and "[t]he controversy is present and concrete . . . ." 355 U. S., at 539.

[13] The question of abstention, of course, is entirely separate from the question of granting declaratory or injunctive relief. See generally *Golden* v. *Zwickler,* 394 U. S. 103 (1969); *Zwickler* v. *Koota,* 389 U. S. 241 (1967).

*Perez* v. *Ledesma,* 401 U. S. 82, 93 (1971) (separate opinion).

Similarly, the availability of declaratory relief in Michigan courts on appellants' federal claims is wholly beside the point. In *Zwickler* v. *Koota, supra,* at 248, we said:

"In thus [establishing jurisdiction for the exercise of] federal judicial power, Congress imposed the duty upon all levels of the federal judiciary to give due respect to a suitor's choice of a federal forum for the hearing and decision of his federal constitutional claims. Plainly, escape from that duty is not permissible merely because state courts also have the solemn responsibility, equally with the federal courts, '. . . to guard, enforce, and protect every right granted or secured by the Constitution of the United States . . . ,' *Robb* v. *Connolly,* 111 U. S. 624, 637."

Compare, *e. g., Askew* v. *Hargrave,* 401 U. S. 476 (1971). The possibility that the Administrator of the Environmental Protection Agency may upon Michigan's application forbid the discharge of even treated sewage in state waters and the asserted absence of present conflict between the Michigan requirements and other state laws are equally immaterial. Just as they do not diminish the immediacy and reality of appellants' grievance, they do not call for abstention.

The last factor relied on by the District Court—the publication of proposed federal standards that might be considered by Michigan in the interpretation and enforcement of its statute—does, however, point toward considerations that fall within the "special circumstances" permitting abstention. The paradigm case for abstention arises when the challenged state statute is susceptible of "a construction by the state courts that would avoid or modify the [federal] constitutional question. *Harrison*

v. *NAACP,* 360 U. S. 167. Compare *Baggett* v. *Bullitt,* 377 U. S. 360." *Zwickler* v. *Koota, supra,* at 249. More fully, we have explained:

"Where resolution of the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law, abstention may be proper in order to avoid unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication. . . . The doctrine . . . contemplates that deference to state court adjudication only be made where the issue of state law is uncertain." *Harman* v. *Forssenius,* 380 U. S. 528, 534 (1965).

That is precisely the circumstance presented here. The Michigan Watercraft Pollution Control Act of 1970 has not been construed in any Michigan court, and, as appellants themselves suggest in attacking it for vagueness, its terms are far from clear in particulars that go to the foundation of their grievance. It is indeed only an assertion by appellees that the Michigan law proscribes the discharge of even treated sewage in state waters. Section 3 (2) of the Act does state that "[i]t is unlawful to discharge . . . sewage . . . from a recreational, domestic or foreign watercraft used for pleasure or for [commerce] . . . ," and § 4 (2) does require vessels equipped with toilet facilities to have sewage storage devices.[14] Yet § 3 (1) seemingly contemplates the dis-

---

[14] We assume that these provisions apply to commercial watercraft, though even this is not textually clear. Section 3 (2) in terms applies only to "recreational" vessels, while § 4 (2)—despite the expansive definition of "watercraft" in § 2 (g)—could be similarly limited in light of § 4 (1), which governs only "pleasure or recreational watercraft."

charge of treated sewage by merely prohibiting any person from emitting sewage "which [renders] the water unsightly, noxious or otherwise unwholesome so as to be detrimental to the public health or welfare or to the enjoyment of the water for recreational purposes." Moreover, § 11 provides that "[t]o be enforceable, the provision [of the Act] or the rule [presumably promulgated thereunder] shall be of such flexibility that a watercraft owner, in carrying out the provision or rule, is able to maintain maritime safety requirements and comply with the federal marine and navigation laws and regulations." Michigan has thus demonstrated concern that its pollution control requirements be sufficiently flexible to accord with federal law. We do not know, of course, how far Michigan courts will go in interpreting the requirements of the state Watercraft Pollution Control Act in light of the federal Water Quality Improvement Act[15] and the constraints of the United States Constitution.[16] But we are satisfied that authoritative resolution of the ambiguities in the Michigan law is sufficiently likely to avoid or significantly modify the federal questions appellants raise to warrant abstention, particularly in view of the absence of countervailing considerations that we have found compelling in prior decisions. See, e. g., Harman v. Forssenius, supra, at 537; Baggett v. Bullitt, 377 U. S. 360, 378–379 (1964).

In affirming the decision of the District Court to abstain, we, of course, intimate no view on the merits of appellants' claims. We do, however, vacate the judgment below and remand the case to the District Court

---

[15] The Michigan courts may also see fit to interpret the Michigan statute in light of the other Supremacy Clause arguments that have have been made in this case. See n. 1, supra.

[16] In the latter regard, see, e. g., Government Employees v. Windsor, 353 U. S. 364 (1957).

with directions to retain jurisdiction pending institution by appellants of appropriate proceedings in Michigan courts. See *Zwickler* v. *Koota,* 389 U. S., at 244 n. 4.

*It is so ordered.*

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE REHNQUIST joins, concurring in the result.

I agree that the complaint presents an actual controversy and that the District Court properly abstained. I therefore concur in the result and join the judgment of the Court.

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE joins, dissenting.

The three-judge court below assigned two grounds for dismissing appellants' complaint: (i) there was no justiciable controversy warranting a declaratory judgment; and (ii) this was an appropriate case for abstention by the federal courts until the Michigan Act is construed by its courts. 336 F. Supp. 248 (1971). This Court today affirms the decision of the court below to abstain, despite rejecting virtually all of the premises upon which it was based.

The opinion of this Court concludes, contrary to the holding below, that the controversy is justiciable and that a case for declaratory judgment relief was stated. The Court also concluded that "abstention was not proper on the majority of grounds given by the District Court." Nevertheless, and despite general disagreement with the trial court on the major issues, its decision to abstain is now affirmed.

As it seems to me that the central thrust of the Court's reasoning (with which I agree) requires reversal rather than affirmance of this decision, I file this dissent.

There is indeed a serious present controversy, involving important federal issues, and posing for the Lake Carriers an immediate choice between the possibility of criminal prosecution or the expenditure of substantial sums of money for antipollution devices and equipment which may not be compatible with the federal regulations which admittedly in due time will be pre-emptive. This presents a classic case for declaratory relief, 28 U. S. C. § 2201, *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U. S. 270, 273 (1941). As the opinion of the Court states, "compliance [with the Michigan law] is coerced by the threat of enforcement, and the controversy is both immediate and real."

On the second question, that of abstention, the Court finally finds a ground in the possibility that the state courts of Michigan may construe the statute in a way that will avoid the federal questions. But this is a slender reed on which to rest a judgment. The Michigan statute is not ambiguous on the issue which appellants deem the most critical, namely, whether they are required under Michigan law to install at considerable expense sewage storage devices that may become unnecessary when federal standards become applicable. Section 4 (2) of the Michigan Act is unequivocal, providing that vessels may not use marine toilets in Michigan waters unless equipped with:

> "(a) A holding tank or self-contained marine toilet which will retain all sewage produced on the watercraft for subsequent disposal at approved dockside or onshore collection and treatment facilities.
>
> "(b) An incinerating device which will reduce to ash all sewage produced on the watercraft. The ash shall be disposed of onshore in a manner which will preclude pollution."

Section 3 (2) flatly prohibits the discharge of sewage into Michigan waters.[1] These two sections unmistakably express Michigan's decision in favor of retention or incineration of sewage aboard ships rather than its treatment and discharge into state waters.[2]

The majority opinion of the Court views § 3 (1) as affording some flexibility and room for interpretation.[3] Yet, it seems clear from the context of the entire statute that § 3 (1) is a general statement of environmental purpose applicable to all persons (as defined), expressing the overall statutory objective of prohibiting pollution of Michigan waters. This section can hardly be construed to contradict the specific provisions of § 4 (2) which relate to the owners and operators of foreign and domestic vessels engaged in commerce upon Michigan waters. Indeed, the Michigan State Attorney General, the Department of Natural Resources and its Director, and the Water Resources Commission and its Executive Secretary *all* read the statute as "designed to prevent appellants and others in their class from pouring their

---

[1] "It is unlawful to discharge, dump, throw or deposit garbage, litter, sewage or oil from a recreational, domestic or foreign watercraft used for pleasure or for the purpose of carrying passengers, cargo or otherwise engaged in commerce on the waters of this state." State of Michigan Act 167, Public Acts of 1970, § 3 (2).

[2] By defining "sewage" in § 2 (d) of the Act to mean all human body wastes, *treated or untreated* (emphasis supplied), Michigan further precludes any possibility that discharge of treated sewage would be permitted.

[3] "A person shall not place, throw, deposit, discharge or cause to be discharged into or onto the waters of this state, any litter, sewage, oil or other liquid or solid materials which render the water unsightly, noxious or otherwise unwholesome so as to be detrimental to the public health or welfare or to the enjoyment of the water for recreational purposes." State of Michigan Act 167, Public Acts of 1970, § 3 (1).

filth, *no matter how well treated,* into Michigan waters of the Great Lakes." (Emphasis supplied.) Brief for Appellees 16.[4]

Appellants have raised federal questions (as to the merits of which no opinion is expressed) which are important to the public as well as to the litigants. They have sought relief in a federal court, relying on "the duty upon all levels of the federal judiciary to give due respect to a suitor's choice of a federal forum for the hearing and decision of his federal constitutional claims." *Zwickler* v. *Koota,* 389 U. S. 241, 248 (1967). It seems probable that these federal questions will remain in their present posture, whatever interpretation may be placed upon the Michigan statute by a state court. The questions of congressional intent to preempt the regulation of marine sanitation devices and of multiple state regulatory schemes which may unduly burden interstate commerce are, in large measure, independent of the particular construction given the Michigan Act.

We have spoken previously of "the delay and expense to which application of the abstention doctrine inevitably gives rise." *England* v. *Medical Examiners,* 375 U. S. 411, 418 (1964). The relegation to state courts of this important litigation, involving major federal

---

[4] Nor do I agree with the majority that § 11 of the Michigan Act affords a reason for abstention. Section 11 provides that any provision or rule under the Act "shall be of such flexibility that a watercraft owner . . . is able to maintain maritime safety requirements and comply with the federal marine and navigation laws and regulations." This language appears to relate only to federal safety, marine, and navigation laws and regulations. It does not refer to the Federal Water Pollution Control Act or to federal laws relating to pollution. It is difficult to believe that this single sentence in § 11 of the Michigan Act could be construed to nullify the other affirmative provisions prohibiting altogether the discharge of sewage.

issues and affecting every ship operating in Michigan waters, is likely to result in serious delay, substantial expense to the parties (including the State), and a prolonging of the uncertainty which now exists.

I would reverse the judgment below and direct the District Court to proceed on the merits.