**LAKE CARRIERS' ASSOCIATION, et al., Plaintiffs,**

v.

**Frank J. KELLEY, Michigan Attorney General, et al., Defendants.**

**Civ. No. 36194.**

United States District Court, E. D. Michigan, S. D.

Dec. 16, 1981.

Russell E. Prins, Asst. Atty. Gen., Lands, Lakes & Leases Div., Lansing, Mich., Marlin F. Scholl, Detroit, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

Before EDWARDS, Chief Circuit Judge, KEITH, Circuit Judge and PRATT,[1] District Judge.

GEORGE CLIFTON EDWARDS, Jr., Chief Circuit Judge.

After years of preliminary litigation,[2] the complaints of shipowners on the Great Lakes against the efforts of the State of Michigan to prohibit their ships' pollution of its waters by emission of sewage, either raw or treated, is back before this Court. Michigan clearly has, by action of its Legislature and Governor, and more recently, by interpretation of the applicable statute by the Michigan Supreme Court, undertaken to make it unlawful for any shipping to discharge either untreated sewage or treated sewage within its state boundaries. Michigan's boundaries encompass Great Lakes shipping lanes and through Lakes Superior, Michigan, Huron and Erie and through the lakes and rivers interconnecting them—thus potentially applying Michigan's pollution standard to most shipping on the Great Lakes whether interstate or international.

This case presents several important, strongly disputed and difficult questions. First, plaintiffs contend that Michigan acted prematurely in its efforts to take advantage of Congress' delegation of authority to the states to "completely prohibit the discharge from all vessels of any sewage, whether treated or not."

Scott H. Elder, Cleveland, Ohio, Prentiss M. Brown, Jr., St. Ignace, Mich., for plaintiffs.

1. This panel is a three-judge district court convened under 28 U.S.C. § 2281 (1970) (repealed 1976) to hear plaintiffs' challenge to the constitutionality under federal law of the Michigan Watercraft Pollution Control Act of 1970, Mich. Comp.Laws Ann. § 323.331 *et seq.* (1975), (Mich.Stat.Ann. § 3.533(201) *et seq.* (1978)).

2. Plaintiffs originally filed suit for a declaratory judgment in federal court. *Lake Carriers' Assoc. v. MacMullan*, 336 F.Supp. 248 (E.D.Mich. 1971). On appeal, the Supreme Court held abstention proper and remanded, ordering that jurisdiction be retained while state proceedings were pursued. *Lake Carriers' Assoc. v. MacMullan*, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972). Both the circuit court and the Michigan Court of Appeals held that the statute prohibited only the emission of inadequately treated sewage. *Lake Carriers v. MacMullan*, 91 Mich.App. 357, 282 N.W.2d 486 (1979). The Michigan Supreme Court held that the Act prohibited all sewage, thus leaving federal issues unresolved. *Lake Carriers v. Director, DNR*, 407 Mich. 424, 286 N.W.2d 416 (1979).

Second, plaintiffs argue that the federal statute authorizing states to prohibit all sewage discharges [3] is unconstitutional because it violates the purpose of uniformity which is implicit in the U.S. Constitution's grant of admiralty jurisdiction to the federal courts.[4]

Third, plaintiffs argue that the statutory delegation of authority just referred to also violates the federal constitution's reservation to the federal government of treaty-making powers in relation to foreign nations—here particularly Canada.

Recognizing as we do that each of plaintiffs' arguments is substantial, we hold (1) that Michigan's actions on this whole record should not be dismissed as premature, (2) that the congressional delegation of authority to the states represents a uniform policy decision by the U.S. Congress which does not offend the Admiralty clause, and (3) that the State and Federal Acts in question do not contravene the treaty-making powers of Congress.

## THE PREMATURITY ISSUE

The federal enactments upon which plaintiffs rely are complicated, confusing and arguably contradictory. As a consequence, we search for interpretation which accords with the legislative history, the congressional purposes and the contemporaneous interpretation of the disputed issues by the agencies to which Congress gave responsibility for enforcement or effectuation of the Act.

The Michigan Watercraft Pollution Control Act of 1970, 1970 Mich.Pub.Acts 167 (Mich.Comp.Laws Ann. § 323.331 *et seq.* (1976)) placed in effect a determination by the state that a prohibition against release of any sewage treated or untreated was essential to "the protection and enhancement of the quality of some or all of the waters within such state." This statute by its terms became effective before any of the various dates contained in the federal legislation—and again by its terms—is still in effect. In addition, on two separate occasions Michigan (through its Governor) petitioned the federal Environmental Protection Agency to place in effect regulations banning release of any sewage into Michigan waters. The first such application filed in early 1975 was denied by the Environmental Protection Agency because it did not contain "substantiating information" that Michigan waters required greater protection than was available generally through the federal enactment.

Michigan thereupon furnished by certification information pertaining to pumpout facilities available for use by shipping within Michigan's waters and renewed its request this time under § 1322(f)(3) of the federal Act. On January 9, 1976, the Administrator of the Environmental Protection Agency granted the certification Michigan had requested reciting as follows:

"On October 9, 1975, notice was published that the State of Michigan had requested a determination by the Administrator, Environmental Protection Agency, pursuant to section 312(f)(3) of Pub.L.92–500, that adequate facilities for the safe and sanitary removal and treatment of sewage from all vessels are reasonably available for the Michigan waters of Lakes Michigan, Huron, Superior, Erie and St. Clair, all waterways, connected thereto, and all inland lakes.

"The information submitted to me certifies that as of 1972 there were 49 public marinas, 104 commercial marinas available for use to the public, and 19 private marinas not available to the public, all of which have pumpout facilities to serve the recreational boating public. The State estimates that the number of recreational pumpout facilities now exceeds 200. It has been certified by the State that the treatment of wastes from each pump-out facility conforms to State and/or Federal requirements as defined

---

3. The Federal Water Pollution Control Act Amendments of 1972, Pub.L.No.92–500, 86 Stat. 816 (October 18, 1972), codified at 33 U.S.C. § 1251 *et seq.* (1976).

4. Art. III, § 2 Clause 1 of the United States Constitution provides in part: "The judicial power shall extend to ... all Cases of admiralty and maritime jurisdiction."

in permit requirements. Moreover it has been certified by the State that although adequate pump-out stations are not available at all commercial ports, licensed septic tank haulers are reasonably available on call or through contract to pump out commercial vessels at any port in Michigan. For the 20 major ports that service commercial vessels, at least one such hauler is available for each of only three ports, and for each of the remaining ports there are up to eight such haulers available. In populated areas such haulers are available within a 15-mile radius from the port, whereas in upper Michigan's unpopulated areas such haulers are available within a 25-mile radius from the port. As part of the license, such haulers must deposit wastes into State-approved municipal treatment facilities.

"The information submitted to me certifies further that the quality or concentration of chemicals presently used as preservatives or odor suppressants for holding tanks will not prove a deterrent to the operation of the receiving municipal wastewater treatment plant. Such septic tank waste haulers are being and can be used successfully within the State of Michigan to pump out commercially the vessel or from a dockside holding vessel holding tanks either directly from the tank to which sewage is pumped using the ship's pump.

"The Agency received approximately 169 comments in support of the Michigan petition. Approximately 26 comments were received opposing the petition; most of these commented on the general inadequacy of recreational pump-out facilities. Specifically, those opposing the petition variously complained of insufficient suction to pump out all types of recreational boats, inadequate operating hours, inconvenient locations, and excessive time requirements for pump out.

"Following an examination of the petition and supporting information, and in consideration of all comments received pursuant to the October 9 FEDERAL REGISTER notice, I have determined that adequate facilities for the safe and sanitary removal and treatment of sewage from all vessels are reasonably available for the Michigan waters of Lakes Michigan, Huron, Superior, Erie and St. Clair, all waterways connected thereto, and all inland lakes. This determination is made pursuant to section 312(f)(3) of Pub.L.92–500."

41 Fed.Reg. 2274 (Jan. 15, 1976).

A major part of our procedural problem concerns what Congress meant in the following three enactments: (1) Congress adopted a section entitled "Federal Standards of Performance":

"(b) Federal standards of performance. (1) As soon as possible, after October 18, 1972, and subject to the provisions of § 1254(j) of this title, the Administrator, after consultation with the Secretary of the department in which the Coast Guard is operating, after giving appropriate consideration to the economic costs involved, and within the limits of available technology, shall promulgate Federal standards of performance for marine sanitation devices (hereafter in this section referred to as 'standards') which shall be designed to prevent the discharge of untreated or inadequately treated sewage into or upon the navigable waters from new vessels and existing vessels, except vessels not equipped with installed toilet facilities. Such standards and standards established under subsection (c)(1)(B) of this section shall be consistent with maritime safety and the marine and navigation laws and regulations and shall be coordinated with the regulations issued under this subsection by the Secretary of the department in which the Coast Guard is operating. The Secretary of the department in which the Coast Guard is operating shall promulgate regulations, which are consistent with standards promulgated under this subsection and subsection (c) of this section and with maritime safety and the marine and navigation laws and regulations governing the design, construction, installation, and operation of any marine sanitation device on board such vessels."

Section 312(b)(1) of the Federal Water Pollution Control Act Amendments of 1972, Pub.L.No.92–500, 86 Stat. 871 (Oct. 18, 1972), codified at 33 U.S.C. § 1322(b)(1) (1976).

(2) Congress then provided for federal preemption of state laws in § 1322(f)(1) as follows:

"(f) Regulation by States or political subdivisions thereof; complete prohibition upon discharge of sewage. (1) After the effective date of the initial standards and regulations promulgated under this section, no State or political subdivision thereof shall adopt or enforce any statute or regulation of such State or political subdivision with respect to the design, manufacture, or installation or use of any marine sanitation device on any vessel subject to the provisions of this section."

(3) Congress then provided two exceptions to the Preemption provision, the first one of which is contained in § 1322(f)(3):

"(3) After the effective date of the initial standards and regulations promulgated under this section, if any State determines that the protection and enhancement of the quality of some or all of the waters within such State require greater environmental protection, such State may completely prohibit the discharge from all vessels of any sewage, whether treated or not, into such waters, except that no such prohibition shall apply until the Administrator determines that adequate facilities for the safe and sanitary removal and treatment of sewage from all vessels are reasonably available for such water to which such prohibition would apply. Upon application of the State, the Administrator shall make such determination within 90 days of the date of such application."

and further provided still another provision in 33 U.S.C. § 1322(f)(4) (current version at 33 U.S.C. § 1322(f)(4)(A)):

"(4)(A) If the Administrator determines upon application by a State that the protection and enhancement of the quality of specified waters within such State requires such a prohibition, he shall by regulation completely prohibit the discharge from a vessel of any sewage (whether treated or not) into such waters."

Adding to the complications already referred to is the fact that the statute also set forth three separate effective dates for various categories of vessels. Section 1322(c)(1)(a) provides that the initial standards and regulations proposed shall become effective "for new vessels two years after promulgation." It also provides that they shall become effective "for existing vessels five years after promulgation." Still a third date is established by § 1322(f)(2) quoted below:

"(2) If, after promulgation of the initial standards and regulations and prior to their effective date, a vessel is equipped with a marine sanitation device in compliance with such standards and regulations and the installation and operation of such device is in accordance with such standards and regulations, such standards and regulations shall, for the purposes of paragraph (1) of this subsection, become effective with respect to such vessel on the date of such compliance."

Under this last provision, vessels then possessing qualifying marine sanitation devices came into compliance as of the date of promulgation of the regulations. As pointed out below in an opinion issued by the General Counsel of the Environmental Protection Agency on September 25, 1975, this last section "has the practical result of causing early preemption of State laws regulating vessel sewage." The General Counsel's opinion is set forth in full as follows:

"Interpretation of 'Effective Date' Language.

"Federal Water Pollution Control Act Amendments of 1972—Section 312(f)(3)—Interpretation of 'effective date' language—Any State having a statute which prohibits discharge of vessel sewage into navigable waters is subject, at any time after January 30, 1975, to preemption of that statute by vessel meeting description outlines in Section 312(f)(2)—Where this occurs, the 'effective date' of initial standards and regu-

lations promulgated under Section 312 is the date of compliance by such vessels—State may then immediately seek greater protection of its waters by prohibiting discharge of vessel waste from all vessels (§ 312(f)(3)).

"The Administrator has asked me to thank you for your letter of September 3 and to reply to your views as to the 'effective date' language in section 312(f)(3) of the Federal Water Pollution Control Act Amendments of 1972 ('the Act'). Our interpretation of 'effective date' for the purposes of 312(f)(3) has its basis in sections 312(c)(1) and (f)(2) of the Act.

"Section 312(c)(1) specifies effective dates for the initial standards and regulations under section 312: two and five years after promulgation for new and existing vessels, respectively. At those times, state laws affecting new and existing vessels are preempted by the Federal standard. The initial standards and regulations under section 312 of the Act were promulgated on January 30, 1975 (see 40 *Fed.Reg.* 4622). As a result of this promulgation, section 312(f)(2) took immediate effect.

"Section 312(f)(2) provides that if a vessel, after promulgation of the initial standards and regulations and prior to their effective dates as specified in 312(c)(1), is equipped with a marine sanitation device which complies with the initial standards and regulations and operation of such device is in accordance with such promulgated standards and regulations, those standards and regulations shall, for the purposes of fulfilling the 'effective date' provisions of 312(c)(1), become effective with respect to that vessel on the date of such compliance. In other words, section 312(f)(2) creates a third category of 'effective dates' for certain specified vessels. This third category of 'effective dates' has the practical result of causing early preemption of State laws regulating vessel sewage.

"Any State having a statute which prohibits the discharge of vessel sewage into or upon navigable waters is subject, at any time after January 30, 1975, to preemption of that statute by vessel meeting the description outlined in 312(f)(2). Where this occurs, the 'effective date' of the initial standards and regulations promulgated under section 312 is the date of compliance by such vessels, and the state may, pursuant to 312(f)(3), immediately seek greater protection for some or all of its waters by prohibiting the discharge of vessel waste from all vessels."

United States Environmental Protection Agency, General Counsel Opinion No. 75–6 (Sept. 25, 1975).

We hold that Michigan's actions in seeking to make its absolute prohibition upon discharge of any sewage were not premature. In this regard, we point to Michigan's enactment of the Michigan Watercraft Pollution Control Act of 1970 and its continuation of that statute in effect after January 30, 1975. We also point to two subsequent requests by Michigan to the Environmental Protection Agency seeking the right under the federal statute to prohibit discharge of any sewage treated or untreated by any vessel after January 30, 1975. Thus, Michigan complied with the federal statutory requirement in § 1322(f)(3).

In this disposition of the prematurity issue in this case, we rely in considerable measure upon the Environmental Protection Agency General Counsel's Opinion just quoted above. In *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450–51, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337, the U. S. Supreme Court pointed out:

"'When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. "To sustain [an agency's] application of [a] statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings."' *Udall v. Tallman*, 380 U.S. 1, 16 [85 S.Ct. 792, 801, 13 L.Ed.2d 616] (1965), quoting *Unemployment*

*Compensation Comm'n v. Aragon*, 329 U.S. 143, 153 [67 S.Ct. 245, 250, 91 L.Ed. 136] (1946).

"Moreover, an administrative 'practice has peculiar weight when it involves a contemporaneous construction of a statute by the [persons] charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.' *Norwegian Nitrogen Products Co. v. United States*, 288 U.S. 294, 315 [53 S.Ct. 350, 358, 77 L.Ed. 796] (1933); *see, e.g., Power Reactor Co. v. Electricians*, 367 U.S. 396, 408 [81 S.Ct. 1529, 1535, 6 L.Ed.2d 924] (1961).

"The question is thus whether, in light of the normal aids to statutory construction, the Department's interpretation is 'sufficiently reasonable' to be accepted by a reviewing court. *Train v. Natural Resources Defense Council*, 421 U.S. 60, 75 [95 S.Ct. 1470, 1479, 43 L.Ed.2d 731] (1975). Our examination of the language, the legislative history, and the overall purpose of the 1897 provision persuades us that the Department's initial construction of the statute was far from unreasonable; and we are unable to find anything in the events subsequent to that time that convinces us that the Department was required to abandon this interpretation."

The statutory interpretation we deal with here is embedded in a lengthy and highly technical statute and its provisions are far from easy to reconcile. Reliance upon early interpretation by the agency charged with carrying out the terms of the Act is peculiarly appropriate under such circumstances. *See generally American Meat Institute v. EPA*, 526 F.2d 442, 450, n. 16 (7th Cir. 1975); *Dow Chemical v. EPA*, 605 F.2d 673, 681 (3rd Cir. 1979).

Furthermore, plaintiffs in this case suggest no reason or logic as to why Michigan's application for the right to enforce its statute should be effective only after all three groups of vessels to which the statute applies are subject to the regulations.

In this proceeding, we are not, of course, dealing with any question as to any prosecution of any vessel for violating the regulation. The record does not disclose that any such prosecutions have been attempted in advance of termination of this litigation. We hold only that Michigan's application to enforce its statute was not premature under the Act.

## THE SUBSTANTIVE ISSUES

### A. *The Admiralty Clause Issue*

Plaintiffs contend that Michigan is undertaking to stop all interstate and international shipping from discharging sewage in its waters in spite of federal law to the contrary. They rely upon the Admiralty Clause contained in Article III § 2 of the U. S. Constitution which reads: "the judicial power shall extend . . . to all cases of admiralty and maritime jurisdiction." Plaintiffs also rely upon case law establishing a uniformity rule in the admiralty jurisdiction. Thus in *The Lottawanna*, 88 U.S. (21 Wall.) 558, 574–575, 22 L.Ed. 654 (1875), the U.S. Supreme Court said:

"That we have a maritime law of our own, operative throughout the United States, cannot be doubted. The general system of maritime law which was familiar to the lawyers and statesmen of the country when the Constitution was adopted, was most certainly intended and referred to when it was declared in that instrument that the judicial power of the United States shall extend 'to all cases of admiralty and maritime jurisdiction.' "

\* \* \* \* \* \*

"One thing, however, is unquestionable; the Constitution must have referred to a system of law coextensive with, and operating uniformly in, the whole country. It certainly could not have been the intention to place the rules and limits of maritime law under the disposal and regulation of the several States, as that would have defeated the uniformity and consistency at which the Constitution aimed on all subjects of a commercial character affecting the intercourse of the

States with each other or with foreign states."

Language to the same general effect may be found in *Southern Pacific Co. v. Jensen*, 244 U.S. 205, 217, 37 S.Ct. 524, 529, 61 L.Ed. 1086 (1917) and in *Knickerbocker Ice Co. v. Stewart*, 253 U.S. 149, 163–64, 40 S.Ct. 438, 441, 64 L.Ed. 834 (1920).

Preliminarily, it may be useful to note that the uniformity principle relied upon in *Lottawanna, Jensen* and *Knickerbocker Ice* appears to have been weakened in subsequent history in such cases as *Red Cross Line v. Atlantic Fruit Co.*, 264 U.S. 109, 124–125, 44 S.Ct. 274, 277, 68 L.Ed. 582 (1924); *Just v. Chambers*, 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903 (1941); *Standard Dredging Co. v. Murphy*, 319 U.S. 306, 63 S.Ct. 1067, 87 L.Ed. 1416 (1943) and *Askew v. American Waterways Operators, Inc.*, 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973).

While none of these cases overrule *Lottawanna, Jensen* and *Knickerbocker Ice*, they do clearly serve to point out that state authority in relation to promoting the health and welfare of its own citizens is by no means eliminated by the admiralty "uniformity" cases previously cited. In the most arguably applicable of the modern cases to our present set of facts, the Supreme Court in a unanimous opinion in the *Askew* case, upheld the validity of a Florida statute subjecting shipowners to clean-up costs occasioned by oil spill damage to the Florida coastline. In doing so, the court relied upon Mr. Justice Stewart's opinion in *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960), upon which case Michigan relies heavily in this instant case. In *Askew* a unanimous court, after discussing the Admiralty Extension Act said as follows:

"*Huron Cement Co. v. Detroit*, 362 U.S. 440 [80 S.Ct. 813, 4 L.Ed.2d 852], however, arose after that Act became effective. Ships cruising navigable waters and inspected and licensed under federal acts were charged with violating Detroit's Smoke Abatement Code. The company and its agents were, indeed, criminally charged with violating that Code. The Court in sustaining the state prosecution said:

'The ordinance was enacted for the manifest purpose of promoting the health and welfare of the city's inhabitants. Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power. In the exercise of that power, the states and their instrumentalities may act, in many areas of interstate commerce and maritime activities, concurrently with the federal government.' *Id.*, at 442 [80 S.Ct., at 815].

"The Court reasoned that there was room for local control since federal inspection was 'limited to affording protection from the perils of maritime navigation,' while the Detroit ordinance was aimed at 'the elimination of air pollution to protect the health and enhance the cleanliness of the local community.' *Id.*, at 445 [80 S.Ct., at 817]. The Court, in reviewing prior decisions, noted that a federally licensed vessel was not exempt (1) 'from local pilotage laws'; (2) 'local quarantine laws'; (3) 'local safety inspections'; or (4) 'local regulation of wharves and docks.' *Id.* at 447 [80 S.Ct. at 818].

"It follows, *a fortiori*, that sea-to-shore pollution—historically within the reach of the police power of the States—is not silently taken away from the States by the Admiralty Extension Act, which does not purport to supply the exclusive remedy.

"As discussed above, we cannot say with certainty at this stage that the Florida Act conflicts with any federal act." *Id.* at 342–44, 93 S.Ct. at 1600–01.

We have discussed the cases cited above presenting potential conflict between admiralty law under the federal jurisdiction and state law concerns primarily because the parties have emphasized them. It is, however, inappropriate for us to continue long without relating our current problem to its

own discrete facts. If we had a direct conflict in this case between federal and state law, the Supremacy Clause would, of course, present a definitive answer. Under the specific facts of our instant case, however, there is no such conflict between the Michigan Watercraft Pollution Control Act of 1970 and the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1251 *et seq.* (1976). As is obvious from the sections of the Federal Act which we have set out previously in discussing the prematurity issue, Michigan has acted under the terms of the federal statute by applying for an exception under § 1322(f)(3) to the preemption clause contained in § 1322(f)(1). This exception, as previously quoted, provides as follows:

"(3) *After the effective date of the initial standards and regulations promulgated under this section*, if any State determines that the protection and enhancement of the quality of some or all of the waters within such State require greater environmental protection, such State may completely prohibit the discharge from all vessels of any sewage, whether treated or not, into such waters, except that no such prohibition shall apply until the Administrator determines that adequate facilities for the safe and sanitary removal and treatment of sewage from all vessels are reasonably available for such water to which such prohibition would apply. Upon application of the State, the Administrator shall make such determination within 90 days of the date of such application."

As we have also previously pointed out, the Federal Environmental Protection Agency Administrator has made the required determination that "adequate facilities for the safe and sanitary removal and treatment of sewage from all vessels are reasonably available for such water to which such prohibition would apply."

Three other points need to be made. The first is that Michigan's action is wholly consistent with the stated purposes of the Federal Act which purposes are:

"(a) The objective of this Act is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In order to achieve this objective it is hereby declared that, consistent with the provisions of this Act—

"(1) it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985;

"(2) it is the national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983;

"(3) it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited;

"(4) it is the national policy that Federal financial assistance be provided to construct publicly owned waste treatment works;

"(5) it is the national policy that areawide waste treatment management planning processes be developed and implemented to assure adequate control of sources of pollutants in each State; and

"(6) it is the national policy that a major research and demonstration effort be made to develop technology necessary to eliminate the discharge of pollutants into the navigable waters, waters of the contiguous zone, and the oceans.

"(b) It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this Act. It is the policy of Congress that the States manage the construction grant program under this Act and implement the permit programs under sections 402 and 404 of this Act. It is further the policy of the Congress to support and aid research relating to the prevention, reduction, and elimination of pollution, and to provide Federal technical

services and financial aid to State and interstate agencies and municipalities in connection with the prevention, reduction, and elimination of pollution.

"(c) It is further the policy of Congress that the President, acting through the Secretary of State and such national and international organizations as he determines appropriate, shall take such action as may be necessary to insure that to the fullest extent possible all foreign countries shall take meaningful action for the prevention, reduction, and elimination of pollution in their waters and in international waters and for the achievement of goals regarding the elimination of discharge of pollutants and the improvement of water quality to at least the same extent as the United States does under its laws."

The Federal Water Pollution Control Act, 33 U.S.C. § 1251.

Second, the structure of the federal enactment retained the power in a federal agency to determine whether the state was prepared "with adequate facilities for the safe and sanitary removal and treatment of sewage from all vessels" and the Administrator has so certified.

Thus, Michigan's prohibition upon the discharge of all sewage treated or untreated into its waters is not only not prohibited by the federal statutory enactments, it is specifically provided for and has been specifically sanctioned by the federal agency charged with responsibility therefor.

Third, inspection of the legislative history of this Act shows that the Governor of Michigan, Governor William Milliken, was quoted very effectively on the floor of the House of Representatives in support of preserving the right for a state to adopt restrictions more stringent than those adopted by the federal government itself and that after vigorous debate, an amendment obviously designed to serve that purpose was offered by a Michigan Congressman, Congressman William D. Ford, and was adopted by a vote of 210 ayes to 173 noes with 49 not voting. The Congressional Record as it applies to the debate on the critical amendment is as follows:

Amendment offered by Mr. William D. Ford:

On page 338, amend lines 4 through 25 to read as follows:

"(f) After the effective date of the initial standards and regulations promulgated under this section, if any State determines that the protection and enhancement of the quality of some or all of the waters within such state require greater environmental protection, such State may completely prohibit the discharge from a vessel of any sewage, whether treated or not, into such waters."

The CHAIRMAN. The Chair will ask the gentleman from Michigan whether the amendment just offered by the gentlemen has been printed in the Record?

Mr. WILLIAM D. FORD. Yes, Mr. Chairman, it has, at page 10045 on March 23.

The CHAIRMAN. The gentleman from Michigan is recognized for 5 minutes in support of his amendment.

Mr. WILLIAM D. FORD. Mr. Chairman and members of the committee, this is a simple amendment designed to preserve the rights of individual States to prohibit discharge of sewage from vessels. I might attempt to explain it on the basis of a lengthy argument in defense of States' rights. Some of my distinguished colleagues might find it surprising that my cosponsor, the distinguished gentleman from Minnesota (Mr. Fraser) and I would be making an argument on the basis of States' rights, but I think the States' rights approach would be appropriate at this point.

I could also make, I believe, a strong argument on the basis of the overall wisdom of this approach to pollution control. But I would like to make a more direct approach, and that is, to ask you to consider the Detroit River, which is a major connection between the Great Lakes, and realize that now with the St. Lawrence Seaway open we carry more tonnage of shipping through that river in its short season than

the annual tonnage which passes through the Panama and Suez Canals combined.

Then I would like you to think about what happens to our drinking water in Michigan each time somebody flushes a toilet on one of those ships. If you do this, I am sure you will understand the kind of appeal that I am making to you here today and I think you will want to support this amendment.

It is not necessary to talk about States' rights in order for you to understand, and you do not need, as has been suggested, a Geiger counter to tell you what kind of pollution contamination is going into the water supplies of some 4 million people in the immediate area of my congressional district.

Twenty of the States, particularly around the Great Lakes, and along the Mississippi River, have now adopted and have in effect stringent regulations with regard to equipping all boats that carry toilet equipment with them, so that they will retain on board their sewage and waste and take it to the shore, and have it pumped out. If we do not adopt this amendment these existing statutes will, in effect, be wiped out.

Mr. Chairman, I know my time is running out, but I would like to close by reading a telegram from Governor William Milliken, of Michigan, which shows very clearly what the dilemma is for these States:

Concerning H.R. 11896 which is now before you, we have not been able to obtain assurances from the EPA that Michigan's position concerning marine pollution would be protected under the new Federal Water Pollution Act. Therefore: I support amending the bill as reported to preserve the right for a State under a State law to adopt restrictions which are more stringent than those adopted by the Federal Government. This is important to the maintenance of Michigan's "no-discharge" boat pollution law.

The other Governors are joining with Governor Milliken of Michigan in asking us not to bar their right to enforce such legislation in the future, or enact legislation which can bar programs already underway, and not, by virtue of the provisions of this act, suspend these State laws for any length of time.

As I read the act, unless we adopt this amendment, laws like Michigan, Minnesota, and Wisconsin laws could become automatically suspended until such time as the EPA decided to write regulations to replace it and that could be up to 5 years. There are 45,000 boats registered in the State of Michigan now and we expect 75,000 by the end of the next 5 years—boats that are big enough to be equipped with toilets or, as some of my Navy friends say—have "heads" on them.

Mr. Chairman, by adopting this amendment we will simply be permitting Michigan and other States which determine the necessity, to enforce as they see fit, the control of vessel discharges within their own lakes and rivers.

Mr. FRASER. Mr. Chairman, will the gentleman yield?

Mr. WILLIAM D. FORD. I yield to the gentleman.

Mr. FRASER. Mr. Chairman, I want to join the gentleman in urging support for this amendment, permitting States to completely prohibit the discharge from a vessel of any sewage, whether treated or not.

The bill before us marks a new and much needed approach to water pollution abatement. It sets admirable goals, provides generous funds, and employs some genuinely innovative and effective administrative procedures, such as the practices of "contract authority" and "user charges." Why then, does it take a backward step with regard to State regulation of marine sanitation devices?

We are still waiting for the final issuance of the Federal regulations required under existing law—Federal Water Quality Act of 1970, section 13f. When issued, these regulations will become effective 5 years after promulgation for existing vessels, and 2 years after promulgation for new vessels. States have had to act. They could not

wait 5 years from some indefinite date in the future to stop waterborne polluters from dumping sewage.

Some have traditionally opposed State sanitary codes, health regulations, factory inspections, and such, on the grounds that it interfered with interstate commerce. Federal courts have, just as traditionally, upheld the right of States to protect the health and safety of their citizens.

The most recent Federal District Court decision, *New York State Waterways Ass'n v. Diamond*, F.Supp. (W.D.N.Y. Jan. 12, 1972) has found that "there is no merit to the claim of the plaintiffs that the statute—New York's law banning sewage-discharge from boats—constitutes an unconstitutional burden on interstate commerce."

The argument is raised that a no-discharge requirement is impractical inasmuch as pumpout facilities do not exist. Pumpout facilities have sprung up wherever and whenever there was a need for them. Michigan, which had 75 pumpout facilities a year ago, has 175 today. On the St. Croix River, within 12 miles of a spot where I have a summer place, there are six pumpout stations, with charges ranging from $3 to $4.50. In addition, "midstreamer services" on the Mississippi are beginning to add pumpout facilities to their other services. They can service vessels on the move. Pumpout facilities are economically viable. When a boatowner stops to have his holding tank pumped out, he probably gets fuel and possibly provisions as well.

As to the cry of "chaos," the amendment I am proposing will not permit 50 gradations of standards. It will permit only two—a no-discharge policy for those States that need it, and whatever standards the EPA sets for others.

Without the threat of Federal preemption, I am convinced that many other States will follow the example of the 20 or so which already prohibit dumping sewage from boats.

The States I refer to are the States of Arizona, California, Colorado, Illinois, Indiana, Maine, Michigan, Minnesota, Missouri, New Hampshire, New Jersey, New York, Oregon, Texas, Utah, Vermont and Wisconsin.

We need this amendment to preserve the right of the States to require holding tanks, otherwise those State laws are going to be wiped out and boats are going to be dumping into the waters that we swim in.

In a way, the struggle over this small issue is a microcosm of the larger struggle to clean up our environment. We all realize the gravity of the water pollution problem. It may already be too late in the case of Lake Erie. But the temptation is still to put off the personal commitment that is necessary if we are to succeed in averting the doom being predicted so graphically by such authorities as Dr. Commoner and the Club of Rome.

Our amendment will cost the Federal Government nothing. But it will require some effort and expense on the part of individual boatowners. It is easier, after all, to eject wastes into the water. The facts are that the actual costs for boatowners to avoid polluting the waters upon which they navigate are within reason. For larger commercial vessels the Ford Motor Co. has set an example. It took only 4 weeks to install a $20,000 retention system in each of its six Great Lakes vessels in order to comply with Michigan law.

If we back down on this one—take this step backward in the struggle to clean up our waters, we will have done a double harm. We will have undone the good work of those States which have had the courage and initiative to pioneer in this field, and we will have indicated to an administration already subject to much pressure that the Congress is willing to go along with weaker regulations.

I urge you to support the marine sanitary devices amendment.

Mr. JONES of Alabama. Mr. Chairman, I will not belabor the point of the gentleman's amendment, but I would like to point out that we here in 1970 did exactly what the gentleman from Michigan, the author of this amendment, asked us to do. That

was to preempt the States' rights in these circumstances in order that we could have some uniform approach to this problem.

So it seems to me we are coming back here today and saying: "Well, in 1970 you were not correct in your judgment of voting for the Water Quality Act and you want to come back and preempt the Federal Government and give it back to the States."

So it seems to me, that is a total inconsistency with what we are dealing with here in this proposition.

The committee recognizes that after the Federal preemption goes into effect, there could be such situations where the need for prohibiting discharges in certain bodies of waters outweighs the need for uniformity among the States.

Where those circumstances occur, subsection F3 of section 312 permits the Administrator, at the request of a State, to require a complete prohibition of discharge from a vessel of any sewage whether treated or not into any portions of the waters within the State.

Mr. Chairman, I regret to oppose the gentleman's amendment, but in all good conscience I do not see how we can march in here one day and take a position and come back and renege on it the next day.

Mr. WRIGHT. Mr. Chairman, will the gentleman yield?

Mr. JONES of Alabama. I yield to the gentleman.

Mr. WRIGHT. Mr. Chairman, I can sympathize with what the gentleman from Michigan seeks to achieve. Surely a State should not be prevented from improving upon the quality of its navigable waters. It is clearly the intention of the committee that the standards to be promulgated by the Administrator for marine sanitation devices shall be strong and forceful standards, coming as near as technology will permit to zero discharge. It also is the intention that the Administrator shall give full and due consideration to the application of any State, as set forth in the committee bill, to require no discharge within its own waters wherever available on-shore treatment and disposal warrant it.

Mr. PIKE. Mr. Chairman, will the gentleman yield?

Mr. JONES of Alabama. I yield to the gentleman.

Mr. PIKE. Mr. Chairman, I rise in opposition to the amendment.

Mr. Chairman, everyone is for pure water, but I expect those who use it most care most about it.

No one needs, appreciates, or is more willing to make sacrifices to achieve clean water than the boatmen who use it and love it.

But enough of generalities—here are some specifics. There were 428,114 boats registered in New York last year. All of them combined contribute less sewage to the waters of our State in 2 years than the city of New York does in 1 day. The Army Engineers tell me that approximately 450 million gallons of raw sewage is dumped into New York Harbor by New York City every single day. But boats shall have holding tanks.

In my own county there were 58,993 boats last year—and all of them combined contributed less sewage to the waters of my county than just one State institution—the State University at Stormy Brook. The State, nevertheless, says boats must have holding tanks.

Because they are an easy target—a cheap shot—the State has singled out the boatowners. Not the huge ocean liners or cargo ships. New York would not think of enforcing its holding tank law against them—just the private boatowners and fishermen and clamdiggers. Sewage is neither better nor worse when it comes out of a boat instead of a house or an apartment or a school. It should be treated exactly the same way. When we are ready to stop sewage or put stringent controls on—fine, hallelujah! But let us not create the illusion of a solution by whipping a scapegoat.

Finally, of course, there has to be uniformity. We who live on Long Island like to sail across Long Island Sound to Con-

necticut and across Block Island Sound to Rhode Island. But these States have a different law, so when I comply with the law in New York I cannot take my boat on a vacation across the sound for they have no facilities for pumping out the holding tanks. I have a boat—and I also have a car. I use my boat in interstate trips in the same manner I use my car or a train on interstate trips. For each State to use its own judgment, not on effluent, but on boat effluent alone, not on sewage treatment equipment, but on boat equipment alone, makes no more sense than to have 50 different gages of railroad tracks or 50 different requirements for automobile carburetors. This amendment should be defeated.

Mr. TERRY. Mr. Chairman, will the gentlemen yield?

Mr. JONES of Alabama. I yield to the gentleman.

Mr. TERRY. Mr. Chairman, I rise in opposition to the amendment.

Mr. Chairman, the present law, which we enacted in 1970, and the regulations promulgated thereunder are so strict that at the present time the only item that would be approved would be a holding tank.

The intent of Congress was set forth when we passed the Federal preemption which was established in 1970. We would be totally repealing that if we would adopt the amendment that is before us.

Those provisions were passed by the Congress because we recognized that vessels in interstate commerce and also many pleasure boats were faced with changing laws from one State to another.

I remember my own State of New York where we first passed the holding tank provision and then did not have holding tanks on certain lakes in order to accommodate the effluent.

We cannot afford to go back to the point of having situations where it cannot be a pleasurable experience to pass from one State to another.

Mr. Chairman, this amendment should be defeated.

We recognize that this amendment is unnecessary. We see nothing that the gentleman has proposed that will not be contained in the new law. The administrator has the right, and as the gentleman from Alabama stated, he can exercise that right where they find a situation that is not covered within the present exemption.

Mr. JONES of Alabama. Mr. Chairman, I should like to make one observation in relation to the attitude of Governors. There has not been a single Governor of any State who has not advocated passage of this bill.

Mr. WILLIAM D. FORD. I agree.

Mr. JONES of Alabama. So I do not think that any petition on behalf of any Governor to change any portion of our bill should cause us to do so. If the National League of Cities, the Governors and county government agencies come in asking us to pass this bill without amendment, why should we now hear about Governors requesting a change in one portion of this bill?

The CHAIRMAN. The question is on the amendment offered by the gentleman from Michigan.

The question was taken: and the Chairman announced that the noes appeared to have it.

TELLER VOTE WITH CLERKS

Mr. FRASER. Mr. Chairman, I demand tellers.

Tellers were ordered.

Mr. FRASER. Mr. Chairman, I demand tellers with clerks.

Tellers with clerks were ordered; and the Chairman appointed as tellers Messrs. WILLIAM D. FORD, GROVER, WRIGHT, and FRASER.

The Committee divided, and the tellers reported that there were—ayes 210, noes 173, not voting 49, as follows: * * *

It is obvious that this debate, initiated by the Great Lakes States and more particularly by Michigan through its Governor and one of its Congressmen, won the right for states to ban all sewage treated or untreat-

ed if they first sought for and received the approval of the federal agency charged with administering the Act. The amendment proposed by Congressman Ford became in haec verba the first half of § 1322(f)(3). The second half of this same § 1322(f)(3) provided the exception requiring that the administrator first determine that there were adequate pumpout facilities available along the waters concerned.

In short, we believe that Michigan and other states properly employed their influence in the Congress of the United States to gain the right under federal law to prohibit any ship from dumping any sewage treated or untreated into Michigan waters.

 By thus responding to the constitutional arguments advanced by plaintiffs based on the Admiralty Clause and federal cases suggesting the need for uniformity in admiralty law, we do not mean to ignore the practical arguments which plaintiffs bring to us. These will be considered under plaintiffs' second constitutional argument, namely, that the Michigan statute offends the equal protection provision of the Fourteenth Amendment. For the moment, we think it is sufficient to respond to the plaintiffs' arguments based upon the Admiralty Clause by what has been said thus far and by adding that the Federal Water Pollution Control Act does provide a uniform scheme looking by progressive stages toward completing elimination of pollution of the nation's waters.

### B. *The Equal Protection Argument*

Plaintiffs' equal protection argument is set forth effectively in the concluding paragraph of Lake Carriers' brief:

"The Michigan Watercraft Pollution Control Act of 1970 seeks to prohibit completely, and in its entirety, the overboard discharge of wastes from plaintiffs' vessels while at the same time no Michigan law prohibits municipalities or shore-based industry from discharging into the Great Lakes. The State obtains no benefit since the shore cities of Michigan do not yet have secondary waste treatment to an extent sufficient to receive wastes from all commercial vessels. There is no evidence that the discharge of waste from a vessel, given secondary treatment, is any more harmful than similar discharges from municipalities or industry. The Michigan Watercraft Pollution Control Act of 1970 does not rest upon any reasonable basis, is essentially arbitrary, and denies to plaintiffs the equal protection of the laws."

Plaintiff Lake Carriers Association Brief, at 25.

In what follows, defendant explicates its position concerning equal protection:

"The provisions of 1970 PA 167 do not violate those standards. First of all, the State points out that there is an essential factual distinction between a shore-based point of discharge of wastes and a shipboard discharge of wastes into the Great Lakes. Michigan has the longest shoreline of any State except Alaska. The shore cities of Michigan not only discharge treated wastes into the waters of the Great Lakes, but these communities also take their drinking water from the Great Lakes. Great care is taken in the location of the water intakes to insure that no waste material is discharged in such a way as to endanger the people who drink this water. The State constantly checks the quality of the water near any water intake. (A.119) [1]. Therefore, if a shore-based discharge facility were to begin to pose any sort of problem in terms of a water intake (or a public bathing beach), the State could take immediate steps to alleviate the problem.

"Vessels, however, do not discharge at a given specific point. As is indicated by the appellants' route maps these boats are not sailing out in the middle of the lakes, but they are, rather, hugging the shoreline. Hence, the discharge of sewage from a boat could be anywhere along the shoreline. Such a discharge could, in fact, be *right over a municipal water intake.* While the State can protect its citizens from the shore-based discharge by keeping a vigilant watch on how close such discharges are to intakes, there is no

conceivable' way in which the State can protect its citizens from a helter-skelter discharge of potentially dangerous wastes along the shoreline by the hundreds of boats which regularly sail along the shoreline. By requiring the boats to discharge into shore-based facilities, the State can control the impact, if any, on shore-based water intakes and bathing beaches. Therefore, in terms of public safety, there is significant and substantial difference between the two types of discharges. (A. 120, 121). Such a factual difference is recognized as a legitimate basis for a difference in treatment.

"1 A. Refers to U.S. Supreme Court Appendix."

Defendant's Brief, at 41–42.

Early on, the U.S. Supreme Court set forth these rules for testing whether or not a state statute violates the equal protection clause:

"1. The equal protection clause of the Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in some inequality. 3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary. *Bachtel v. Wilson*, 204 U.S. 36, 41 [27 S.Ct. 243, 245, 51 L.Ed. 357]; *Louisville & Nashville R.R. Co. v. Melton*, 218 U.S. 36 [30 S.Ct. 676, 54 L.Ed.

921]; *Ozan Lumber Co. v. Union County Bank*, 207 U.S. 251, 256 [28 S.Ct. 89, 91, 52 L.Ed. 195]; *Munn v. Illinois*, 94 U.S. 113, 132 [24 L.Ed. 77]; *Henderson Bridge Co. v. Henderson City*, 173 U.S. 592, 615 [19 S.Ct. 553, 562, 43 L.Ed. 823]."

*Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78–79, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1910). *See also New Orleans v. Dukes*, 427 U.S. 297, 303–304, 96 S.Ct. 2513, 2516–2517, 49 L.Ed.2d 511 (1976).

It is not, of course, surprising that Michigan—surrounded by the Great Lakes and host state to the shipping fleets of her sister states plus those of Canada and the world—should be particularly concerned about ship pollution. It seems likely that no state has greater reason to take advantage of the federal statutory exception in order to seek to purify its waters. Further we cannot deem it "essentially arbitrary" for Michigan to distinguish between the hazards to its drinking water intake points [5] posed by countless mobile ship polluters and fixed and identifiable shore-based pollution sources. By their nature, the latter are much more easily watched over and guarded against than are the former.

Additionally, in seeking a major public good, like clean water, a state has a right to proceed, by stages, to its objective.

We hold that the Michigan Watercraft Pollution Control Act of 1970 does not offend the equal protection clause of the Fourteenth Amendment to the U. S. Constitution.

By what we have said above concerning the constitutional and legal issues we are required to decide, we do not intend to denigrate the importance of the debate concerning the costs in ship delay at pumpout locations or alternatively, the costs of installing larger holding tanks or equipment for burning all sewage residue and then placing the ash on shore. We have no doubt that these are practical problems of great magnitude. They also, however, con-

5. One of the plaintiffs' exhibits shows that Michigan had as of 1960, 50 cities dependent upon water intakes from the Great Lakes as compared to the second state in order, Ohio which has 24.

cern legislative decisions within the jurisdiction of the U. S. Congress and the Michigan legislature and their decisions to this point have been detailed above.

### THE FOREIGN TREATY ISSUE

In many respects what we have said already applies equally to the arguments advanced by plaintiff Dominion Marine Association. In its complaint, Dominion (representing 175 vessels of Canadian registry) contends concerning the Michigan Watercraft Pollution Control Act of 1970:

"Shortly after passage of the Act many members of DMA received letters from defendants and/or their predecessors charged with enforcing and/or prosecuting violations of the Act, advising them of its principal provisions and requesting information as to plans for compliance. DMA, therefore, believes enforcement of the Act will be sought by defendants against its members and Canadian registered vessels, and defendants have admitted such intention in answer to DMA's claim in the Michigan state court proceeding.

"By a decision filed December 27, 1979, the Supreme Court of Michigan determined that the Act absolutely prohibits the discharge of treated (or untreated) vessel wastes into Michigan waters, rejecting summarily interpretations placed upon the Act by the Circuit Court for the County of Mackinac and the Michigan Court of Appeals which would have permitted vessels to treat wastes in accordance with federal standards prescribed by the United States and Canada both as to devices used and the purity of the effluent produced.

"DMA charges that the Act as so interpreted conflicts with the provisions and the expressed and intended national policies of both the United States and Canada under the Boundary Waters Treaty of 1909, 36 Stat. 2448, Treaty Series No. 548 and, more specifically, the United States and Canadian Great Lakes Water Quality Agreement of April 15, 1972, *United States Treaties and Other International Agreements* Vol. 23 Part 1, 1972, p. 301 et seq., and is therefore beyond the authority of the State of Michigan and invalid and unenforceable."

Complaint of Plaintiff Dominion Marine Association, at 3.

In its argument, Dominion relies upon the Boundary Waters Treaty of 1909, United States-Great Britain 36 Stat. 2448 et seq., T.S. No. 548 and in particular the following language therein:

"—the navigation of all navigable boundary waters shall forever continue free and open for the purposes of commerce to the inhabitants and to the ships, vessels, and boats of both countries equally, subject, however, to any laws and regulations of either country, within its own territory, not inconsistent with such privilege of free navigation and applying equally and without discrimination to the inhabitants, ships, vessels, and boats of both countries."

36 Stat. 2448 at 2449.

Dominion also cites the following language from the Great Lakes Water Quality Agreement of 1972, 23 U.S.T. 301, T.I.A.S. No. 7312:

"—in accordance with principles at least as stringent as the following:

(a) Garbage shall not be discharged by a vessel into these waters

(b) Waste water shall not be discharged by a vessel into these waters in amounts or in concentrations that will be deleterious;

(c) Every vessel operating in these waters with an installed toilet facility shall be equipped with a device or devices to contain the vessel's sewage, or to incinerate it, *or to treat it to an adequate degree.* Emphasis supplied."

23 U.S.T. 301 at 334 (Annex 4).

We are unable to find in this record any prohibition upon free navigation for Canadian ships. As is clear from what has been said earlier, whatever expense or inconvenience Michigan's requirement of "no sewage discharge" may cause to Canadian shipping will likewise apply "without discrimination"

to the "ships, vessels and boats of both countries." As to the language quoted from the Great Lakes Water Quality Agreement of 1972, Michigan statute is certainly "at least as stringent" as the standards set forth immediately above.

 We have reviewed the language of these international treaties and find no provision contained therein which is violated by the Michigan Watercraft Pollution Control Act of 1970 or the Federal Water Pollution Control Act and the 1972 amendments thereto; nor indeed do we find any essential conflict between said treaties and said Acts.

Finally, and we believe quite conclusively, the Great Lakes Water Quality Treaty itself specifically provides:

"3. The specific water quality objectives adopted pursuant to this Article represent the minimum desired levels of water quality in the boundary waters of the Great Lakes System and are not intended to preclude the establishment of more stringent requirements."

Great Lakes Water Quality Treaty, *supra*, at 304.

We find no conflict between the treaties upon which Dominion Marine relies and the two statutes at issue in this case.[6]

For all of the reasons set forth above, judgment may be entered in this case dismissing plaintiffs' complaints and holding:

1) Michigan's actions seeking to implement 1970 Public Act 167 are not subject to dismissal as premature,

2) the congressional delegation of authority to the states contained in the Federal Water Pollution Control Act of 1970 as amended in 1972 represents a uniform policy decision by the U. S. Congress which does not offend the Admiralty clause or the equal protection clause of the U. S. Constitution, and

3) the State and Federal Acts in question do not contravene the treaty-making powers of Congress.

IT IS SO ORDERED.

---

**6.** In the Reply Brief of Plaintiffs, filed June 24, 1980, is included a *Memorandum of Understanding Concerning Marine Sanitation Devices Pursuant to the Great Lakes Water Quality Agreement*, dated May 6, 1980, and executed by representatives of the United States and Canadian Coast Guards. That Memorandum provides in part:

"(1) Canadian commercial vessels meeting the provisions of the Canadian marine sanitation device (MSD) regulatory requirements will be permitted to operate in U. S. waters of the Great Lakes;"

This appears to be an understanding arrived at between the two services for enforcement purposes. Since there is no indication of approval by Congress, it can have no effect on the treaty issue in this case.