MINNESOTA GAS COMPANY, a Delaware Corporation, Plaintiff,

v.

PUBLIC SERVICE COMMISSION, DEPARTMENT OF PUBLIC SERVICE, STATE OF MINNESOTA, and City of Minneapolis, State of Minnesota, Defendants.

No. 4–74–Civ. 289.

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 12, 1974.

George C. Mastor, Mastor & Mattson, Minneapolis, Minn., for plaintiff.

Warren Spannaus, Atty. Gen. by Thomas H. Jensen, Sp. Asst. Atty. Gen., and Peter W. Sipkins, Sol. Gen., St. Paul Minn., for Public Service Commission.

Walter Duffy, City Atty. by Arvid M. Falk, Asst. City Atty., Minneapolis, Minn., for City of Minneapolis.

## MEMORANDUM AND ORDER

LARSON, District Judge.

This action for a declaratory judgment challenges the constitutionality of § 36 of the Minnesota Public Utilities Act of 1974 (Minn.Stats. § 216B.36) insofar as it impairs the 1970 Franchise Agreement between plaintiff and the City of Minneapolis. Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331, 2201. Presently pending are motions by defendant Public Service Commission to dismiss the action for lack of subject matter jurisdiction, on abstention grounds, and for failure to state a claim upon which relief can be granted. Oral argument on these motions was heard on November 9, 1974.

Plaintiff Minnesota Gas Company ("Minnegasco") is a Delaware corporation which distributes natural gas in Minnesota. Minnegasco has provided gas service in the City of Minneapolis since 1870. It presently operates in Minneapolis under a Franchise Agreement with the City concluded on December 30, 1969, and effective for a 25-year period commencing January 1, 1970. The Franchise established rates to be charged in January 1970 and a mechanism for annual adjustment of rates. As a privately owned public utility, Minnegasco will be subject in 1975 and thereafter to regulation of its rates and service areas by the Public Service Commission under the Public Utilities Act of 1974.

Section 36 of the Public Utilities Act expressly provides that rates and service areas determined by the Commission will supersede those in effect under exist-

ing franchises.[1] Minnegasco argues that, except in an emergency situation not present here, its Franchise with Minneapolis is inviolable. It seeks a declaration that the impairment of the Franchise by § 36 violates the Contract Clause of Art. I, § 10, and the Due Process Clause of the Fourteenth Amendment.

If the Court should uphold § 36, Minnegasco seeks in the alternative a declaration that the entire Franchise is terminated and both parties excused from all obligations thereunder.

## JURISDICTION

28 U.S.C. § 2201 empowers this Court to grant a declaratory judgment "[i]n a case of actual controversy within its jurisdiction." The Commission urges dismissal on the ground that there is no actual controversy with Minnegasco until the Commission exercises its power under the Act to alter Minnegasco's rates or areas of service. Minnegasco argues that § 36 of the Act, effective April 12, 1974, has already impaired its rights under the Franchise by depriving it of authority to set rates pursuant to the Franchise for the years 1975–1994.

■■ There is no mechanical test for determining whether an actual case or controversy is present:

"The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory

judgment. [Citation omitted.]" Maryland Casualty Co. v. Pacific Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

The following cases were held to lack sufficient immediacy and reality to constitute an actual controversy: Int'l Longshoremen's Union Local 37 v. Boyd, 347 U.S. 222, 74 S.Ct. 447, 98 L.Ed. 650 (1954) (resident aliens who customarily traveled to Alaska for seasonal work sought a declaratory judgment against an administrative construction of a new immigration law which would treat them upon return from work in Alaska as if they were aliens seeking entry into the United States for the first time); Public Serv. Comm. v. Wycoff Co., 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952) (carrier sought declaration that its intrastate transportation was protected by the Commerce Clause from any possible regulation by State commission); United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947) (federal employees desiring to participate in political campaigning sought declaration that Hatch Act prohibition on such activity was unconstitutional). Compare with the foregoing the following cases which the Supreme Court entertained as justiciable controversies: Lake Carriers' Assoc. v. MacMullan, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972) (shipowners sought declaration invalidating State law requiring on-board sewage storage devices where no enforcement was to take place until land-based pump-out facilities became available); Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970) (involving, in part, action by the United States seeking declaration, prior to its effective date, that Federal law lowering voting age and otherwise overriding State electoral requirements was constitutional); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (pri-

1. The pertinent part of § 36 reads:
 "All existing . . . . franchises . . . shall not be impaired or affected in any respect by the passage of this act, except

with respect to matters of rate and service regulation and service area assignments that have been vested to the jurisdiction of the [public service] commission by this act."

vate schools, alleging immediate decline in enrollments, sought declaration invalidating, prior to its effective date, State law requiring children to attend public schools). Although the guidance provided by these two groups of decisions is far from clear, it seems that a justiciable controversy is presented when a new law alters, or concretely threatens to alter, a pre-existing course of conduct (e. g., dumping of sewage from ships, imposition of voting requirements by States, or operation of private schools).

■ In the case at bar, the Public Utilities Act of 1974 establishes new standards and mechanisms for regulating the rates and service areas of private utilities in Minnesota. Even were the Commission not to review the Minnegasco rates for years, the presence of presumptively valid authority to do so would nonetheless have substantial impact on Minnegasco's planning, financing, and dealing with suppliers. The Act concretely threatens to alter Minnegasco's present conduct of its gas distribution business in Minnesota. Since Minnegasco would thus be immediately affected by the Act and since it claims that the State has previously relinquished its authority to make any such regulations, this suit raises a justiciable controversy.

## ABSTENTION

■■ The Supreme Court has indicated that abstention is appropriate where a challenged State statute is susceptible of "a construction by the state courts that would avoid or modify the [federal] constitutional question. [Citations omitted.]" Zwickler v. Koota, 389 U.S. 241, 249, 88 S.Ct. 391, 396, 19 L.Ed. 2d 444 (1967). The Court has cautioned that the grounds for abstention must be substantial so as to justify "the delay and expense to which application of the abstention doctrine inevitably gives rise." England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 418, 84 S.Ct. 461, 466, 11 L.Ed.2d 440 (1964). The parties agree that there is no ambiguity as to the rate-making powers

granted the Commission by the Public Utilities Act. The Commission urges abstention on other grounds. It seeks a determination in State court of (1) the extent of the State's inherent police power to regulate rates, and (2) whether the State relinquished that power in granting a city charter to Minneapolis. From the exhaustive briefs submitted by the parties, it is clear that these questions have been definitively answered by the Minnesota Supreme Court. Abstention under these circumstances would serve no useful purpose. Therefore, the Court must turn to the merits of the motion to dismiss for failure to state a claim.

## MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

*Inherent Power to Regulate—*

State ex rel. Tri-State Telephone and Telegraph Co. v. Holm, 138 Minn. 281, 164 N.W. 989 (1917), upheld the power of the Legislature to override the terms of a franchise between a municipality and a telephone company in granting the Railroad and Warehouse Commission, the predecessor of the Public Service Commission, exclusive authority to license use of public streets by telephone utilities. *Tri-State* relied on the inherent power of the State to regulate utilities which serve the public (138 Minn. at 284, 164 N.W. at 990):

> "It is quite clear to us that no vested right of the village was impaired or affected by the legislature when it undertook to interfere with the rates established in this franchise. Insofar as rates were therein fixed it was for the benefit [sic] of the public. And it is unquestioned that the legislature is supreme when it comes to prescribing or altering the rates which public service corporations may exact from their patrons. As said by Pitney, J.: 'The constitutional limitations which prevent the legislature from impairing the obligations of contracts do not debar it from annulling obligations that are due to the public.' Cortelyou v. Anderson, 73 N.J.Law, 427, 63 Atl.

1095. The regulation of public utilities is an exercise of the police power of the state and resides with the legislature."

Western States Utilities v. City of Waseca, 242 Minn. 302, 65 N.W.2d 255 (1954), again held that an inconsistent franchise provision must yield to State statute. The Court there noted:

"' * * * if the public interest be established the regulation of rates is one of the first forms in which it is asserted, and the validity of such regulation has been settled since Munn v. State of Illinois, 94 U.S. 113 [24 L.Ed. 77 (1877)].' " Western States Utilities, *supra*, at 308, 65 N.W.2d at 261, quoting Justice Holmes in Block v. Hirsh, 256 U.S. 135, 157 (1921).

 Minn.Stats. §§ 300.03–300.04 are declaratory of the inherent power of the State to regulate utility rates. Section 300.03 includes in the definition of a "public service corporation" any corporation "organized for the construction, acquisition, maintenance, or operation of . . . any work for supplying the public, by whatever means, with wa-

ter, light, heat, or power." Section 300.-04 provides in part:

"The state shall at all times have the right to supervise and regulate the business methods and management of any such corporation and from time to time to fix the compensation which it may charge or receive for its services."

These sections were in effect in 1920 when the Charter of the City of Minneapolis was adopted and in 1969 when the present Franchise was executed.[2]

*Authority Delegated by the State to Minneapolis—*

Under the Home Rule provision of the Minnesota Constitution, Art. IV, § 36,[3] the City of Minneapolis adopted its present charter on November 2, 1920. The sections of the Charter which plaintiff cites as the authority for Minneapolis to enter into a binding and inviolable agreement with Minnegasco are those dealing with the general power to contract,[4] with the power to contract for erection of gas works to provide public lighting,[5] with control of the quality and measurement of gas,[6] and with control of all public ways within the city.[7] As plaintiff con-

---

2. Plaintiff contends that §§ 300.03–300.04 are limited to domestic corporations and, therefore, have no application to Minnegasco. The Court does not accept plaintiff's reading of Chapter 300, Minn.Stats., and holds that §§ 300.03–300.04 are fully applicable to Minnegasco's business in Minnesota. Even if the Court were to accept this construction, it would (as discussed below) still conclude that the State had inherent power to regulate the rates to Minnesota consumers.

3. Art. IV, § 36, now repealed, provided in pertinent part: "Any city or village in this state may frame a charter for its own government as a city consistent with and subject to the laws of this state." The repeal of this section in 1958 does not imply that charters adopted under this section should no longer be interpreted as subject to the superior authority of the Legislature.

4. "The City of Minneapolis . . . shall be capable of contracting and being contracted with, and shall have all the general powers possessed by Municipal Corporations at

common law . . . ." Charter, Ch. 1, § 1, at p. 1.

5. "Tenth.— . . . to provide for the lighting of the City and contract for the erection of gas works for lighting the streets and public grounds and public buildings, . . . ." Charter, Ch. 4, § 5, clause 10, at p. 22.

6. "Thirty-fifth.—To regulate and control the quality and measurement of gas; to prescribe and enforce rules and regulations for the manufacture and sale of gas; to provide for the inspection of gas and gas meters, and to appoint an inspector and other officers if needed for that purpose, and prescribe their duties." Charter, Ch. 4, § 5, clause 35, at p. 26.

7. "The City Council shall have the care, supervision and control of all highways, streets, alleys, public squares and grounds within the limits of the city, . . . ." Charter, Ch. 8, § 1, at p. 54.

cedes, there is no authority in the Charter for Minneapolis to regulate utility rates.

█ In describing a long-term contract between a municipality and a water utility, the Minnesota Supreme Court distinguished a municipality's proprietary powers from its legislative powers:

> "The authorities are very uniform that contracts of this nature are not within the legislative or governmental prerogatives of the municipalities, but rather within its proprietary or business powers. Their purpose is not to govern the inhabitants, but to secure for them and for itself a private benefit. [Citations omitted.]" Reed v. City of Anoka, 85 Minn. 294, 298, 88 N.W. 981, 982 (1902).

The rate-making provisions of the Minnegasco Franchise are an exercise of Minneapolis' proprietary power. Minneapolis has no inherent legislative power to set utility rates and the State has not delegated any such power to it.

*The Franchise Construed in Accordance with the Powers Remaining with the State—*

"* * * Minn.Const. art. 4, § 36, expressly preserves the right of the legislature to enact general laws which are paramount to home rule charters. Monaghan v. Armatage, 218 Minn. 108, 15 N.W.2d 241." Ramaley v. City of St. Paul, 226 Minn. 406, 411, 33 N.W.2d 19, 22 (1948). The rights and duties under the Franchise are subject to the paramount power of the State "to supervise and regulate the business methods and management of any [public service] corporation and from time to time to fix the compensation which it may charge or receive for its services." Minn.Stats. § 300.04. The State has exercised its reserved power in the Public Utilities

Act of 1974 and any inconsistent provisions in the Franchise must yield.

█ Apart from § 300.04, the Court holds in the alternative that the State retains an inherent power to regulate utility rates superior to any contract power of the City. The Court subscribes fully to the rationale of the West Virginia Supreme Court in City of Benwood v. Public Service Commission, 75 W.Va. 127, 83 S.E. 295 (1914). In considering a challenge to newly enacted State regulation of water rates, *Benwood* confronted the same issue which is raised here: "May the Public Service Commission alter a rate that was fixed by franchise ordinance prior to the enactment of the law by which the commission was created and given powers?" 83 S.E. at 296. The Court in *Benwood* first affirmed the rate-making power of the State:

> "Though the grant and acceptance of the ⸲franchise wherein certain rates were fixed, created a contract between the water company and the City of Benwood, the rates thereby fixed are nevertheless cognizable for revision by the Public Service Commission under the broad powers delegated thereto, unless prior to the delegation of those powers the Legislature had expressly delegated power to the City of Benwood which authorized the city to contract inviolably for the rates mentioned in the franchise for the period stated therein. Rate-making is a legislative act. It is inherent in and belongs primarily to the Legislature." *Id.*

It then examined the powers granted the City of Benwood in its charter, noting a power to erect gas works and a general power to make contracts. Relying on Home Telephone & Telegraph v. Los Angeles, 211 U.S. 265, 29 S.Ct. 50, 53 L.Ed. 176 (1908),[8] it held that there was

---

8. *Benwood* cited the following passage from *Home Telephone & Telegraph*:

"It has been settled by this court that the state may authorize one of its municipal corporations to establish, by an inviolable contract, the rates to be charged by a public service corporation (or natural person) for a definite term, not grossly unreasonable in point of time, and that the effect of such a contract is to suspend, during the life of the contract, the governmental power of fixing and regulating the

a "presumption against exclusive delegation of the Legislature's sovereign rate-making power to a municipality." 83 S.E. at 297. It concluded that there had been no delegation "by clear and express terms" and that, therefore, "the power is reserved in the state, which can exercise it at such times and to such extent as may be found advisable." *Id.*

This Court concludes that the inherent power of the State to regulate the rates of a public utility, as well as the statute declaratory of that power, require granting the motion to dismiss the constitutional challenge for failure to state a claim upon which relief could be granted.

*The Validity of the Remainder of the Franchise—*

The Legislature has provided in § 36 of the Act that, except with respect to rates and service areas, existing franchises "shall not be impaired or affected in any respect by the passage of this act." As noted in *Benwood,* the city and the utility company "were bound by cognizance of the fact that their dealings were subject to future exercise of the Legislature's power over rates." 83 S.E. at 297. Since the Franchise does not provide for release of either party in the event of legislative intervention, it must be interpreted as requiring the parties to assume the risks of whatever changes the Public Service Commission may impose. This interpretation in no way offends the Contract Clause or the Due Process Clause of the Constitution. Minnegasco's alternative prayer for relief must also be dismissed for failure to state a claim.

ORDER

Accordingly, upon all the records, files, and proceedings herein,

It is hereby ordered:

1. That the motion of the Public Service Commission to dismiss the action for lack of subject matter jurisdiction is denied.

2. That the motion of the Public Service Commission to dismiss the action on abstention grounds is denied.

3. That the motion of the Public Service Commission to dismiss the action for failure to state a claim is granted, and plaintiff's alternative prayer for relief is dismissed.

4. That this action is dismissed.

rates * * * But for the very reason that such a contract has the effect of extinguishing pro tanto an undoubted power of government, both its existence and the authority to make it must clearly and unmistakably appear, and all doubts must be resolved in favor of the continuance of the power." *Home Telephone & Telegraph,* 211 U.S. at 273, 29 S.Ct. at 52.