799 F.2d 1473
 24 ERC 2034, 17 Envtl. L. Rep. 20,088
 BROWNING-FERRIS INDUSTRIES OF ALABAMA, INC., a corp. & E.
Harrell Hammonds, Plaintiffs-Appellants,
v.
ALABAMA DEPT. OF ENVIRONMENTAL MGMT.; Leigh Pegues, as
Director of the Ala. Dept. of Environmental Mgmt.; Dr.
Dewey A. White, Jr., Bryce Scott Davis, Thomas R. DeBray,
Dr. Claire B. Elliott, Dr. Cameron M. Vowell, J. Ernest
Farnell, and Stanley Graves, as members of the Environmental
Mgmt. Commission of the Ala. Dept. of Environmental Mgmt.,
Defendants-Appellees.
 No. 85-7639.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 22, 1986.
 
 Walter R. Byars, Steiner, Crum & Baker, Montgomery, Ala., for plaintiffs-appellants.
 Robert A. Huffaker, Rushton, Stakely, Johnston & Garrett, Montgomery, Ala., for Dr. Dewey A. White, et al.
 Mark Alan Peycke, Montgomery, Ala., for Alabama Dept. of Environmental Mgmt.
 Appeal from the United States District Court for the Middle District of Alabama.
 Before CLARK, Circuit Judge, HENDERSON*, and WISDOM**, Senior Circuit Judges.
 CLARK, Circuit Judge:
 
 
 1
 This appeal is taken from the district court's dismissal of the plaintiffs' claim for declaratory relief as not ripe for adjudication. Upon consideration of both "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration," Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), we find that the facial challenges to the Alabama statute at issue here are indeed ripe for adjudication, in view of the particular facts presented to us. We, thus, reverse the decision of the district court dismissing this action and remand to that court for further proceedings.
 
 I. Background
 
 2
 During 1981, Browning-Ferris Industries (BFI) began geological testing of certain land in Lowndes County, Alabama to determine the feasibility of locating a hazardous waste treatment facility and disposal site thereon, and in June of that year it acquired an option to buy the land. BFI then filed Part A of its permit application for the site with the Alabama Department of Environmental Management (ADEM) and the U.S. Environmental Protection Agency and was involved in the much more lengthy and complicated process of preparing Part B of its application as of December, 1981.[1]
 
 
 3
 On December 4, 1981, the Minus Act, providing, inter alia, that "no commercial hazardous waste treatment or disposal site not in existence on or before November 19, 1980, shall be situated without resolution giving [legislative] approval therefor," was added to the law of the State of Alabama. Act of December 4, 1981, No. 81-1189, Sec. 2, 1981 Ala.Acts, 3d Ex.Sess. 523 (codified at Ala.Code Sec. 22-30-5.1 (1984)). After the passage of the Minus Act, it was ADEM's policy to require legislative approval pursuant to the Minus Act before commencing the review of any permit application. This policy was consistent with that section of the Alabama Code which authorizes ADEM to administer and enforce chapter 30 of title 22 of the Code of Alabama, the chapter and title incorporating the Minus Act. See Ala.Code Sec. 22-22A-5(1).
 
 
 4
 BFI was unsuccessful in attempts to obtain a legislative resolution approving the Lowndes County site as required by the Minus Act, and it discontinued its efforts to submit Part B of its permit application because it found that its efforts would be both costly and futile without a prior legislative approval.
 
 
 5
 On February 22, 1985, BFI and the owner of the Lowndes County site filed a complaint in the United States District Court for the Middle District of Alabama seeking a declaratory judgment that the Minus Act is invalid.[2] The complaint also seeks injunctive relief to bar consideration of the Minus Act during the permitting process and enforcement of the Act should BFI proceed with development of the proposed site without having obtained legislative approval.
 
 
 6
 The defendants filed motions to dismiss on grounds of lack of jurisdiction and failure to state a claim upon which relief can be granted. ADEM admitted that prior to and at the time of the institution of this litigation its policy was to require legislative approval pursuant to the Minus Act before commencing the review of any permit application; however, subsequent to the filing of this action, ADEM reversed this policy so that thereafter it would receive and make its decision upon permit applications based strictly on the Alabama Hazardous Waste Management Act and the Alabama Hazardous Waste Management Regulations without requiring a prior legislative resolution under the Minus Act. Under this new policy, in the event a permit is granted at the conclusion of the application process, ADEM informed the district court that it would then notify the permittee of the requirements of the Minus Act and would take some undetermined enforcement action should the permittee attempt to locate, construct, or operate a hazardous waste treatment facility or disposal site without complying with the Minus Act.
 
 
 7
 ADEM further stated that the permitting process will require approximately five years from the date of filing of Part B of the permit application and that it will undertake no effort at enforcement of the Minus Act against any applicant prior to the conclusion of that five-year period. The district court then ruled, based upon this policy reversal by ADEM, that the claim for declaratory relief is not ripe for adjudication because "Browning-Ferris will face compliance with the Minus Act only in the event it receives a permit from the Department...." The district court further held that the claims for injunctive relief have been rendered moot.
 
 II. Discussion
 
 8
 The Supreme Court has most recently addressed the question of ripeness with regard to declaratory judgment actions in Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission:
 
 
 9
 The basic rationale of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 1515-16, 18 L.Ed.2d 681 (1967). In Abbott Laboratories, which remains our leading discussion of the doctrine, we indicated that the question of ripeness turns on "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." Id. at 149, 87 S.Ct. at 1515.
 
 
 10
 461 U.S. 190, 200-01, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983).
 
 
 11
 In its arguments on appeal, appellant, BFI, has focused on the second part of this "twofold aspect" of ripeness--"the hardship to the parties of withholding court consideration"--while the appellees have instead emphasized "the fitness of the issues for judicial decision."
 
 
 12
 BFI argues that ADEM's "new policy," which merely changes the situation from one of immediate harm by enforcement of the challenged statute as a condition precedent to reviewing a permit application to one of threatened harm by enforcement of the statute after considering BFI's application, does not make this case any less ripe for decision. It states that prior to passage of the Minus Act it had already expended approximately $518,500 in developing the necessary geological information for the permitting process plus $103,000 to acquire an option on the land and was within 30 days of submitting Part B of its application when ADEM adopted its "old policy" of requiring legislative approval by resolution under the Minus Act prior to considering a permit application. BFI further notes that it now has an investment of over $1,175,000 in the project, an investment which it must either abandon or supplement with a substantial additional investment to prepare a current Part B and complete the permitting process. Moreover, even then, it must wait approximately five years before it will find out if its permit will be approved, and only then would it find out how the Minus Act would come into play if its request for a declaratory judgment is declared unripe for decision now.
 
 
 13
 BFI likens its situation here to that in Pacific Gas & Electric concerning which the Supreme Court stated:
 
 
 14
 The question ... is predominantly legal.... Moreover, postponement of decision would likely work substantial hardship on the utilities. As the Court of Appeals cogently reasoned, for the utilities to proceed in hopes that, when the time for certification came, either the required findings would be made or the law would be struck down, requires the expenditures of millions of dollars over a number of years, without any certainty of recovery if certification were denied.
 
 
 15
 Id. at 201, 103 S.Ct. at 1720-21 (footnote omitted). Paraphrasing this passage from Pacific Gas, the appellants state:
 
 
 16
 [F]or BFI to proceed in hopes that, when the time for permitting came, either the required legislative approval would be given or the Minus Act would be struck down requires the expenditures of substantial dollars over a number of [five] years, without any certainty of recovery if legislative approval were denied.
 
 
 17
 Brief of Plaintiffs-Appellants at 24.
 
 
 18
 Again paraphrasing Pacific Gas & Electric, the company argues that for ADEM to require BFI to proceed without knowing whether the Minus Act is valid would impose "a palpable and considerable hardship." 461 U.S. at 201-02, 103 S.Ct. at 1721.
 
 
 19
 Thus, appellants urge, as in the Rail Reorganization Act Cases, 419 U.S. 102, 144, 95 S.Ct. 335, 359, 42 L.Ed.2d 320 (1974), that "decisions to be made now or in the short future may be affected" by whether the courts act, and that " '[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough.' " Id. at 143, 95 S.Ct. at 358 (quoting Pennsylvania v. West Virginia, 262 U.S. 553, 593, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923)).
 
 
 20
 Appellees counter by arguing that a proper consideration of the constitutional challenges to the Minus Act would be aided by further development of the facts surrounding its application and "the fitness of the issues for judicial decision" is thus lacking in this case. They further contend:
 
 
 21
 A deferral of a ruling on the validity of the Minus Act would permit the legislature to establish its own criteria for determining whether approval of the hazardous waste site should be granted or, alternatively, would permit the legislature to receive the fact findings made by ADEM during the permitting process which could then be used by the legislature in determining whether to extend its approval for the waste site.
 
 
 22
 Brief of Appellees, Members of the Environmental Management Commission of the Alabama Department of Environmental Management, at 11-12. Even the facial challenges to the constitutionality of the Act do not mandate an immediate adjudication, they argue, because the constitutional challenges may never become ripe. For example, they note, a ruling on the constitutionality of the Act would be unnecessary if BFI discontinued its efforts aimed at securing a permit from ADEM, if BFI's proposed site were inadequate to meet the regulatory criteria for an approved site, if legislative approval were extended to BFI, or if the Minus Act were subsequently modified or repealed. In support of this argument, appellees cite a different portion of the Court's opinion in Pacific Gas & Electric than that cited by appellants to bolster their contentions. Appellees note that the challenge which the Court allowed in Pacific Gas & Electric was to a section of the California Public Resources Code which imposed "a moratorium on the certification of new nuclear plants until the [state] Energy Commission 'finds that there has been developed and that the United States through its authorized agency has approved and there exists a demonstrated technology or means for the disposal of high-level nuclear waste.' " 461 U.S. at 198, 103 S.Ct. at 1719. It is from this section of the opinion that BFI has drawn support for its case. The appellees, however, argue that this case is more closely analogous to the challenge which the Court held was not ripe for adjudication in Pacific Gas & Electric, a challenge to the section of the California Code which directed the Energy Commission to make a case-by-case determination of the adequacy of storage capacity for nuclear waste prior to allowing additional nuclear plants to be built. As to this section, the Court held:
 
 
 23
 While the waste disposal statute operates on a statewide basis, the Energy Commission is directed to make determination under Sec. 25524.1(b) on a case-by-case basis. As the Court of Appeals explained, because "we cannot know whether the Energy Commission will ever find a nuclear plant's storage capacity to be inadequate," judicial consideration of this provision should await further developments.
 
 
 24
 461 U.S. at 203, 103 S.Ct. at 1721-22.
 
 
 25
 Finally, appellees contend that this case is not ripe because of lack of adversity of the parties. They disclaim any responsibility for the enforcement of the Minus Act. This contention, however, falters on Ala.Code Sec. 22-22A-5(1), noted, at 1474, supra, which authorizes ADEM to administer and enforce chapter 30 of title 22 of the Alabama Code, the chapter and title incorporating the Minus Act.
 
 
 26
 BFI's main response to the argument that the issues are not yet fit for judicial decision is that, even after ADEM's change of policy, the facial challenges to the Minus Act remain justiciable.[3] Since, as in Abbott Laboratories, "the issue tendered is a purely legal one," 387 U.S. at 149, 87 S.Ct. at 1515, BFI argues that further factual development is unnecessary.
 
 
 27
 We are impressed by the fact that in this case BFI sought a legislative resolution approving the commercial hazardous waste treatment or disposal site from the Alabama Legislature which took no action on BFI's request. This was at a time that ADEM required approval from the Legislature before undertaking any review of an application. This made the constitutionality of the Minus Act ripe for adjudication. The State through its Legislature and ADEM have cast serious doubt upon whether a hazardous waste permit could ever be obtained.
 
 
 28
 Consideration of the "hardship to the parties" aspect of ripeness militates in favor of allowing BFI's declaratory judgment action to proceed at present. Should it not be allowed to proceed to adjudication now and the Minus Act be eventually declared unconstitutional some five years hence, then the only hardship to BFI would be the unpredictability of its position up to that point. If, however, the Minus Act were eventually upheld, then the harm to BFI would be equal to the money and effort it would have expended in going through Part B of the permit process before it failed to get the legislative approval required by the Minus Act plus the cost of not expending those resources on other projects. Thus, in the end, it comes down to how you phrase the question:
 
 
 29
 Should BFI have to wait five years and expend millions of dollars before even discovering if it cannot get legislative approval, it must challenge the Minus Act at that time?
 
 
 30
 or
 
 
 31
 Since BFI would have to put the five years and millions of dollars into the permitting process even sans the Minus Act, why should it be allowed to challenge the Act now?
 
 
 32
 The former way of expressing the concerns at issue here wins out over the latter in this case because whether or not BFI will actually invest the time and money to go through the permit application process is an economic decision that it must make based upon its judgment of its likelihood of ultimate success. Since legislative approval under the Minus Act has already been refused, whether the Act passes constitutional muster or not is of immediate and tangible concern to BFI.
 
 
 33
 The question of "the fitness of the issues for judicial decision" in essence comes down to a decision as to whether the court is presented with an abstract question or a concrete controversy. The most often quoted commentary on this subject has come from Justice Murphy in Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941):
 
 
 34
 The difference between an abstract question and a "controversy" contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.
 
 
 35
 As this passage makes clear, whether particular facts are sufficiently immediate and real to constitute an actual controversy and thus present an issue fit for judicial decision is something that must be worked out on a case-by-case basis. One set of commentators, in attempting to do the impossible by reconciling the numerous published decisions making this judgment call as to a matter of degree, has made the following assessment:
 
 
 36
 There is little difficulty in finding an actual controversy if all of the acts that are alleged to create liability already have occurred. ... The problem is when a declaration is sought on the legal consequences of some act that may or may not occur.
 
 
 37
 It is clear that in some instances a declaratory judgment is proper even though there are future contingencies that will determine whether a controversy ever actually becomes real.
 
 
 38
 ....
 
 
 39
 [T]he practical likelihood that the contingencies will occur and that the controversy is a real one should be decisive in determining whether an actual controversy exists.... Thus, for example, courts have declined to hear cases seeking a declaratory judgment on the constitutionality of a particular statute or ordinance when plaintiff has not shown that there is any immediate threat that the statute will be enforced against him. But, courts also have not hesitated to issue a declaration if "one or both parties have taken steps or pursued a course of conduct which will result in ' "imminent" and "inevitable" litigation, provided the issue is not settled and stabilized by a tranquilizing declaration.' "
 
 
 40
 C. Wright, A. Miller & M. Kane, 10A Federal Practice and Procedure: Civil 2d Sec. 2757 at 585-97 (1983) (quoting Bruhn v. STP Corp., 312 F.Supp. 903, 906 (D.Colo.1970), which in turn quotes Borchard, Declaratory Judgments 57 (2d ed. 1941)) (footnotes omitted). Cf. Wembley, Inc. v. Superba Cravats, Inc., 315 F.2d 87, 89 (2d Cir.1963).
 
 
 41
 More helpful than these generalities, however, are examples of cases in some ways similar to the one under consideration. Both sides have noted similarities to the two statutes discussed in Pacific Gas & Electric, with the appellants arguing that the Minus Act most closely resembles the statute as to which a declaratory judgment action was allowed and the appellees countering that the closest resemblance is to the other statute, as to which a challenge was determined to be not yet ripe for adjudication. Another case with features close to the one at hand is National Bank of Detroit v. Wayne Oakland Bank, 252 F.2d 537 (6th Cir.1958). In that case, the district court issued a declaratory judgment that it would be unlawful for a national bank to open a branch in violation of state law, and the court of appeals held that the declaratory judgment was properly issued even though the Comptroller of the Currency had not yet approved the application of the national bank to open the branch.
 
 
 42
 A parallel to the assertion of ADEM in this case that it will not seek to enforce the Minus Act until such time in the future as the permit application process is complete and the application approved, may be found in Lake Carriers' Association v. MacMullan, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972). In Lake Carriers', Michigan authorities indicated that they would not seek to enforce a new Michigan law requiring ships with marine toilets to have sewage storage devices until adequate land-based pump-out facilities were available to service vessels with the required sewage storage devices. The Supreme Court nevertheless held that the challenge to the Michigan law by owners of such vessels presented a controversy that was both immediate and real and that was ripe for decision under the Declaratory Judgment Act as a result of the fact that the "threat of enforcement" required the vessel owners to "get into a position to comply with the Michigan statute." Id. at 508 & n. 11, 92 S.Ct. at 1756 & n. 11.
 
 
 43
 Two other cases cited in the Court's opinion in Lake Carriers' in support of this holding are Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed.2d 1070 (1925) and City of Altus, Oklahoma v. Carr, 255 F.Supp. 828 (W.D.Tex.) (three judge court), aff'd per curiam, 358 U.S. 35, 87 S.Ct. 240, 17 L.Ed.2d 34 (1966). In Pierce, the Supreme Court allowed two private schools to maintain an action to enjoin the enforcement of an initiative measure requiring parents and guardians to send their children to public school even though the measure was not to be effective for several years. The complaints alleged that the defendant officials had announced their intention to proceed under the law and that, as a result, parents were withdrawing children or refusing to enter them in complainants' schools, to their immediate and irreparable harm.
 
 
 44
 Of all the cases on record, perhaps the closest to the concerns at issue here is the City of Altus case, which the Supreme Court cited approvingly in Lake Carriers'. In City of Altus, the challenged law was a recently enacted Texas statute prohibiting, without legislative approval, the removal of water from an underground source in Texas for use in another state. The City of Altus, Oklahoma wanted to buy water from land owned by C.F. Mock and his wife, Pauline, across the border in Texas. The City of Altus first had the land tested as to the quantity and quality of the subsurface water and the cost of production in July, 1964. In November, 1964, the Mocks granted the city a nine month option to purchase a lease for producing water from the subsurface water-bearing formations underlying the Mocks' land. Then, in December, 1964, the voters of Altus authorized a bond issue to finance this water project. The bonds were issued in May, 1965, and that same month the City of Altus and the Mocks executed a lease authorizing the City to extract the subsurface water. On May 28, 1965, however, the Texas Legislature passed the new law requiring legislative approval prior to the removal of any underground water in Texas for use in another state. The Mocks and the City of Altus filed suit for a declaratory judgment that the Texas statute was unconstitutional as violative of the commerce clause and for a permanent injunction against its enforcement. The three-judge district court held:
 
 
 45
 The very presence of the statute itself and the possibility of its enforcement would preclude the Plaintiffs from making the further substantial expenditures of tax monies necessary to obtain and transport the water from the Mock's land to the City of Altus. Already, although no water has yet been transported in interstate commerce in violation of [the Texas statute], the plaintiffs have incurred expenses in the approximate amount of $110,720.09, and would incur further expenses in the approximate amount of $1,311,582.69 to effectuate the project.... We are of the opinion that the present case comes well within the purpose of [the Declaratory Judgment Act].
 
 
 46
 City of Altus, supra, 255 F.Supp. at 836-37 (footnotes omitted).
 
 
 47
 A careful consideration of these cases in conjunction with the facts of this case leads us to the conclusion that the facial challenges to the Minus Act, at least, are ripe for declaratory relief.[4] The potential hardship to the plaintiffs is substantial, and the controversy surrounding the legality of the Minus Act has developed beyond the status of a mere abstract question. Just as in City of Altus, the appellants have invested a great deal of time and money in their project and would have to incur "further expenses ... to effectuate the project," and, furthermore, "[t]he very presence of the statute itself and the possibility of its enforcement would preclude the Plaintiffs from making the further substantial expenditures of ... monies necessary to" go forward with their plans. Id. The state authorities here, as in Lake Carriers', have indicated that they would not seek to enforce the new law until some future date; however, as the Supreme Court held in that case, the challenge to the law nonetheless presents a controversy that is immediate, real, and ripe for decision under the Declaratory Judgment Act because the "threat of enforcement" is sufficient to affect the activities of the plaintiffs in a substantial way. To paraphrase the court in Minnesota Gas Co. v. Public Service Commission, 394 F.Supp. 327, 332 (D.Minn.1974), aff'd on the merits, 523 F.2d 581 (8th Cir.), cert. denied, 424 U.S. 915, 96 S.Ct. 1114, 47 L.Ed.2d 320 (1976), even were ADEM not to apply the Minus Act to BFI for years, the presence of presumptively valid authority to do so would nonetheless have substantial impact on BFI's planning, financing, and dealings with suppliers and customers.
 
 
 48
 BFI's claim for injunctive relief requiring ADEM to process its permit application without consideration of the Minus Act is obviously moot as a result of ADEM's change in policy so that it now offers to do precisely that. BFI's other claim for injunctive relief, enjoining ADEM from enforcing the Minus Act, moves along a different path, however. Whether or not it is moot depends upon whether or not the declaratory judgment complaint is ripe for adjudication. Thus, since we have held the complaint ripe, this second claim for injunctive relief is not moot.
 
 
 49
 For these reasons, we reverse the judgment of the district court dismissing this action and remand to that court for determination of the facial challenges to the Minus Act raised by the plaintiff.
 
 
 50
 REVERSED and REMANDED.
 
 
 
 *
 See Rule 3(b), Rules of U.S. Court of Appeals for the Eleventh Circuit
 
 
 **
 Honorable John Minor Wisdom, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation
 
 
 [1]
 Part A of the application is aimed primarily at securing for ADEM an identification of the proposed hazardous waste management activities and a general description of the scope of those activities. Part B requires a comprehensive and technical description of the proposed site and the activities to be conducted thereon so that ADEM can determine if the proposed operations will meet federal and state hazardous waste management standards
 
 
 [2]
 The challenges to the Minus Act raised by the plaintiffs, which appear in paragraphs 14-20 of their complaint, as amended, may be summarized as follows:
 p 14--"While the Legislature has the authority to require hazardous waste in Alabama (concurrently with the USEPA), it has delegated that authority to ADEM. The Legislature in the Hazardous Waste Management Act, as amended, has delegated to ADEM the right to develop rules and regulations for hazardous waste permitting and management, and to issue all permits for hazardous waste treatment facilities and disposal sites. The Legislature is bound by this delegation, and cannot reserve to itself the right to make the final determination as to the permitting of hazardous waste site, without ascertainable standards or criteria related to the object of the regulation of hazardous waste."
 p 15--The rights of due process and equal protection are violated because the legislature reserved the right to approve or disapprove a site without ascertainable standards or criteria for making that decision and thus may make an arbitrary and capricious decision.
 p 16--Failure of the legislature to grant approval results in a taking of property without due process of law since it is not subject to judicial review.
 p 17--The exemption from legislative approval for "industries with on-site treatment, storage and disposal of their own hazardous waste" (1) violates equal protection because it discriminates against the class composed of those who seek to operate commercial hazardous waste disposal sites without a rational basis, and (2) places an unreasonable burden on interstate commerce because it "restricts the State's hazardous waste disposal policy to only those wastes generated within the State."
 p 18--State law separation of powers claim: "In the event the Legislature is attempting to review the action of ADEM, to which it has delegated authority to issue all permits for hazardous waste treatment facilities and disposal sites, then it is attempting to exercise the judicial function" in violation of the separation of powers under the Alabama Constitution.
 p 19--This is a state law claim that seems to be something of a restatement of p 14. It's essence is that "[a]n attempt at the overruling of the statutory delegation to ADEM by resolution rather than bill" violates the Alabama Constitution.
 p 19A--Equal protection claim that Minus Act discriminates in favor of the one existing and approved commercial hazardous waste facility in Alabama as of November 19, 1980, without a rational basis by virtue of the Act's grandfather clause exempting commercial hazardous waste treatment or disposal sites in existence on or before November 19, 1980. There is also a claim in this paragraph alleging that the Act thus grants the one existing facility an exclusive franchise in violation of the Alabama Constitution.
 p 20--Claim that a more recent Alabama statute has repealed by implication the Minus Act since the more recent statute grants to ADEM the exclusive authority to regulate hazardous waste.
 
 
 [3]
 All of the challenges to the Minus Act raised in the complaint, as amended, with the possible exception of the claim in paragraph 16 of the complaint, are claims that the statute is invalid on its face rather than as applied. See note 2, supra. As such, no further factual development is required for their resolution
 
 
 [4]
 Worries as to what should happen to challenges to the statute as applied, which are presumably those as to which the appellees argue for further factual development, are addressed in California v. La Rue, a case involving a First Amendment challenge to newly promulgated state administrative regulations prohibiting nude dancing on the premises of liquor license holders. The parties there stipulated that the plaintiffs offered performances violative of the regulations and that the defendants would take disciplinary action against license holders breaching the rules, and the Supreme Court wrote: "Because of the posture of this case, we have necessarily dealt with the regulations on their face, and have found them to be valid.... 'Although it is possible that specific future applications of [the statute] may engender concrete problems of constitutional dimension, it will be time enough to consider any such problems when they arise.' " 409 U.S. 109, 119 n. 5, 93 S.Ct. 390, 397 n. 5, 34 L.Ed.2d 390 (1972) (quoting Joseph E. Seagram & Sons v. Hostetter, 384 U.S. 35, 52, 86 S.Ct. 1254, 1264, 16 L.Ed.2d 336 (1966))